IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ORION DRILLING COMPANY, LLC.,        )
Plaintiff,                           )
v.                                   )        Civil Action No. 16-1516
EQT PRODUCTION COMPANY,              )        Magistrate Judge Maureen P. Kelly
Defendant,                           )
v.                                   )        Re: ECF No. 146
EQT PRODUCTION COMPANY,              )
Counter Claimant,                    )
v.                                   )
ORION DRILLING COMPANY, LLC.,        )
Counter Defendant.                   )

## MEMORANDUM OPINION AND ORDER

**Maureen P. Kelly, United States Magistrate Judge**

Presently before the Court is a Motion to Strike and for Sanctions filed on behalf of Defendant EQT Production Company ("EQT"), ECF No. 146/148. The Court has thoroughly reviewed the relevant documents supporting the Motion to Strike, ECF Nos. 147/149, those opposing the Motion, ECF No. 198, and in reply, ECF No. 206, and has heard oral argument in support and in opposition of the Motion on Friday, December 7, 2018. For the reasons that follow, the Motion to Strike and for Sanctions will be granted in part and denied in part.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of the alleged breach of two contracts entered into between Plaintiff Orion Drilling Company, LLC ("Orion") and EQT for the construction of two oil and gas drilling rigs by Orion, and two subsequent contracts for Orion to conduct daywork drilling operations using both rigs on EQT's behalf. Following EQT's acceptance and taking possession of both rigs, there were three dropped block incidents that occurred during drilling operations on Rig 18. After the

third incident, Rig 18 was pulled out of service and inspected over the course of weeks by specialists retained on behalf of each party. Ultimately, EQT terminated the daywork drilling contracts with Orion for operations using either Rig 18 or Rig 17. EQT contends that Orion materially breached the drilling contracts by utilizing unsafe equipment due, in part, to control systems which incorporate faulty and incomplete software. EQT alleges that this defect renders the operation of the rigs exceedingly dangerous to personnel on each rig.

Orion filed this breach of contract action contending, in part, that the rigs were subject to "take-or-pay" agreements that preclude termination of the secondary drilling contracts without early termination payments. Orion alleges that at the time of EQT's termination, all operational software and hardware faults had been identified and corrected within the contract period for cure. Accordingly, the rigs are fit for purpose and can safely be utilized for drilling operations. Orion claims that under these circumstances, EQT's failure to abide by the early termination provisions of each drilling contract constitutes a breach entitling Orion to liquidated damages in the amount of approximately $32,000,000.

### A. Incomplete Discovery Responses by Orion

The parties have engaged in extensive discovery. Relevant to the instant Motion to Strike, EQT served Orion with the following Second Set of Requests for Production of Documents ("RFP"), and received the indicated responses:

> **Request for Production No. 7:**
>
> Please produce any and all documents regarding the "revision change[s]" discussed in Section 6.2.4 or 6.4.1.4 of the Software Design Package document located at IDS0007413-7416 (the "Software Design Package").
>
> **RESPONSE:** Orion objects to this Request because it is not reasonably limited in time, is not relevant to any party's claims or defenses, not proportional to the needs of the case, and seeks highly confidential and proprietary information that can only be examined with proprietary software.

Furthermore, Orion objects to this because it asks Orion to search for and produce documents in possession of a third party. Subject to these objections, IDS has previously produced documents responsive to this Request.

**Request for Production No. 8:**

Please produce any and all documents regarding the "software revisions" discussed in Section 6.4.1.2 of the Software Design Package.

**RESPONSE:** *See* Orion's Objections and Response to Request Number 7.

**Request for Production No. 9:**

Please produce any and all documents regarding any other "revision change[s]" or "software revisions."

**RESPONSE:** *See* Orion's Objections and Response to Request Number 7.

**Request for Production No. 10:**

Please produce any and all documents regarding the factory Acceptance Test discussed in Section 6.9 of the Software Design Package.

**RESPONSE:** IDS does not have responsive documents to this Request.

**Request for Production No. 11:**

Please produce any and all documents regarding any and all other testing described in the Software Design Package.

**RESPONSE:** IDS does not have responsive documents to this Request.

**Request for Production No. 12:**

Please produce any and all documents regarding the "lab simulations" discussed in Section 5.2 of the Orion 18 Incident Report document located at IDS0007460-7464.

**RESPONSE:** *See* Orion's Objections and Response to Request Number 7.

**Request for Production No. 13:**

Please produce any and all documents regarding the "PLC program ... update[s]" discussed in section 4.1 of the Orion 18 Incident Report document located at IDS0007532-7534.

**RESPONSE:** *See* Orion's Objections and Response to Request Number 7.

**Request for Production No. 14:**

Please produce any and all documents regarding any other "PLC program ... update[s]."

**RESPONSE:** *See* Orion's Objections and Response to Request Number 7.

**Request for Production No. 15:**

Please produce any and all documents regarding the "vigorous lab simulations and ... onsite tests" discussed on page 1 of the document located at IDS0007585-7591.

**RESPONSE:** *See* Orion's Objections and Response to Request Number 7.

ECF No. 92-3 at 12-14. In addition, EQT submitted Interrogatory No. 5, seeking identification of "any and all testing or inspections conducted on Rig 17 or Rig 18 by Orion, or any contractor of Orion, prior to Rig 17 and Rig 18 being delivered to EQT." ECF No. 92-6 at 12. Orion objected, indicating as follows:

> Orion objects to this Interrogatory because the phrase "testing or inspections" is vague, ambiguous and undefined. Rigs 17 and 18, along with various components that make up Rigs 17 and 18, were examined, tested, inspected, and assessed pursuant to appropriate industry standards and practices, including compliance with component manuals provided by the manufacture[r]. By way of further response, Orion will produce documents related to the commission testing Orion conducted on Rigs 17 and 18 once Orion has completed its review of those documents. Lastly, Orion directs EQT's attention to the documents Orion, IDS, and ADC already produced in this ligation that may contain[] information that is responsive to interrogatory."

ECF No. 92-6 at 13.

EQT sent similar requests to Integrated Drive Systems ("IDS"), the manufacturer of the control system software. Beginning in June 2017, IDS refused to provide all versions of its source code, citing proprietary intellectual property concerns, and this information was not provided to EQT by Orion.[1] However, as confirmed during argument on the pending Motion to Strike, IDS and Orion shared certain common ownership and, as of April 2017, both were subsidiaries of the same holding group identified as OD Management. Orion and IDS also shared counsel who

---

[1] IDS refused to produce its source code, despite the existence of a confidentiality agreement and protective order entered in this matter on February 8, 2017. ECF No. 23.

participated in the responses to discovery requests in this action, and it is apparent that the requested information was in Orion's access or control.

Thereafter, the parties engaged in discussions regarding alleged deficiencies in Orion's written discovery responses and on March 12, 2018, EQT requested that Orion provide EQT with supplemental responses prior to the commencement of depositions of key Orion employees. ECF No. 92 at 1-2. Orion responded to certain of the requests and interrogatories on March 17, 2018, ECF No. 206-1. With regard to Interrogatory No. 5, Orion was asked to supplement its previous response and to identify any and all testing or inspections conducted on Rig 17 or Rig 18 by Orion or any Orion contractor prior to delivery of the rigs to EQT. Orion identified three specific documents it represented confirmed commission testing and referenced approximately 1300 pages of documents it stated included commission testing documents. ECF No. 206-1 at 13. However, Orion did not directly answer the interrogatory by identifying dates and types of testing or inspections conducted on Rig 17 or Rig 18 prior to delivery of the rigs to EQT.

### B. EQT's Motion to Compel as to Orion's Deficient Discovery Responses

EQT filed a Motion to Compel, ECF No. 92, seeking additional responses to its Second Set of Interrogatories and Request for Production, including the requests identified above. Orion filed a response to the Motion, indicating that it had produced documents responsive to Interrogatory No. 5, and that it was not in possession of any documents responsive to the remaining identified RFPs. ECF No. 95. A hearing on the Motion to Compel was conducted on March 22, 2018, and counsel for EQT explained the relevance of the rig software control and management to its contention that the rigs were unsafe. ECF No. 99 at 23-24. Orion stated it had provided 16,000 documents in response to the document requests, but the Court learned Orion had failed to identify the corresponding responsive document or group of responsive documents for each RFP. Id. at 6-

13. Orion further represented that it was not in possession of documents responsive to EQT's requests for information related to lab simulations and PLC updates, and that such documents, if they did exist, remained in the possession of IDS. Id. at 26, 30. Further, counsel for Orion represented to the Court on the record that it did not have any documents relative to RFP Nos. 7, 8, 9, 10, 11, 12, 13, 14, 15, 17 and 18. ECF No. 99 at 26.

### C. Court Orders for Orion to Supplement and Provide Discovery Responses

On the record during the March 22, 2018 hearing and following the hearing, this Court entered its Order granting in part EQT's Motion to Compel. The Court directed Orion to rectify what was essentially a "document dump" and to generally identify the documents produced in response to each discovery request, including Interrogatory No. 5, with a range of Bates-numbered documents. ECF No. 99 at 14-15. In addition, Orion was directed to produce all documents relative to changes that had been made to the software or equipment in Rigs 17 and 18 prior to delivery and during operation. Id. at 16. The Court accepted Orion's representation that no documents relative to software testing or the control system were in its possession or control. Id. at 34.

### D. Orion's Continued Failure to Produce Requested Documents

Following the completion of fact discovery, the parties exchanged expert reports and commenced expert discovery. Justin Ray, Ph.D., ("Ray") issued a report on behalf of EQT dated September 18, 2018, and opined that IDS failed to follow generally accepted engineering practices for safety related systems in developing control software for Rigs 17 and 18 and, as a result, the control software contributed to the dropped block incidents that occurred on Rig 18. Most notably, in arriving at his opinion that IDS's software process omits process activity documentation, Ray relied upon the discovery provided by Orion as well as Orion's representations regarding

maintenance of control system software architecture and design. Based upon the evidence provided, Ray determined that the absence of software design processes rendered the rigs unsafe and contributed to at least four dropped block incidents on Rig 18. ECF No. 149-4 at 388 – 502.[2]

One month later, Richard Hooper, Ph.D., ("Hooper") issued a report on behalf of Orion, challenging each of Ray's conclusions and finding that the IDS system incorporated and used a software management tool and software configuration control system.[3] ECF No. 149-6. The software is contained in a computer portal, identified as the "TIA [Totally Integrated Automation] Portal." Orion states that the TIA Portal is a widely used engineering product that assists in the management and development of control system software. Hooper learned that IDS used the TIA Portal during his first inspection of the IDS product development facility and explained that the TIA Portal contained a suite of products used by IDS to design and update the control system software of Rig 17 and Rig 18. Hooper further explained that the TIA Portal holds the updates for the various versions of the software for each rig, which may be downloaded for review. In addition, Hooper was provided the IDS source code, access to the hardware-based simulator for rig control system development, and the PLC connections and component parts. ECF Nos. 149-7, 149-8.

In challenging Ray's conclusions, Hooper states:

- I have inspected IDS' software development environment, software management tool and software configurations control system (TIA Portal). I also inspected its

---

[2] See, e.g., Justin Ray, Ph.D. Expert Report: "[t]his section discusses the test plans and test results that were found in the evidence. In summary, documents and testimony included evidence of system-level acceptance tests (although these system-level tests may not be complete). However, no test plans or test results for module or integration tests were found in searches of the available evidence. The lack of the latter is notable because specific test strategies recommended by IEC 61508 (boundary testing) could have identified the specific error that caused two of the dropped block incidents." ECF No. 149-4 at 393.

[3] Hooper is proffered solely for rebuttal expert opinion in response to Ray's expert opinions for EQT.

hardware-based simulator for rig control system development and its simulated driller's console for rig control system development. ECF No. 149-7 ¶ 9.

- Items B and C [regarding incorrect data and mathematical formulas] reference errors IDS found in its control software during the investigation after dropped block event #2. Both items B & C occurred in the same block of source code. The code is effectively a "governor" that will not allow the drawworks to move the drill string faster than the motor can support. The governing action did not work correctly before the errors were fixed. Id. ¶ 32

- The Ray report begins its assessment of IDS' software process activities at 4.2 with the general finding that documentation was incomplete or missing. 4.2.1-4.2.5 then list the activities and documentation Dr. Ray was expecting to find. I disagree. As detailed below, when I reviewed IDS' processes and documentation, I found the information Dr. Ray reported as missing. I found this information in the drawing package for the rig, IDS' Engineering Change Notice (ECN) process, the rig Quote Document, and IDS' use of the industry-standard TIA Portal for software development. The TIA Portal is a package of software development tools created by Siemens Corporation. The TIA Portal includes functionality for visualizing software architecture, for reviewing software changes, for software design, for software simulation, and for software configuration management. Id. ¶ 61

- 4.2.1 of the Ray report discusses IDS' software architecture, but it does not discuss that IDS uses the TIA Portal to both create the software and visualize the software architecture. Dr. Ray's opinions regarding software architecture are incorrect at least because he did not consider IDS' use of the TIA Portal for software

development.  I reviewed IDS' use of the TIA portal and it complied with industry standards regarding software architecture. Id. ¶ 62

- The TIA Portal also provides test and simulation functionality.  During my review of IDS' use of the TIA portal, I confirmed that IDS was using this functionality when they developed Rigs 17 and 18.  As discussed, Dr. Ray did not consider the TIA Portal.  The use of the TIA Portal is an industry-standard method of testing and simulation. Id. ¶ 68.

- During my inspection of the IDS facilities, I noted a hardware-based system for simulating and testing rig software.  It has motors, sensors and computers to simulate rig hardware and was clearly being used.  IDS personnel told me they were using this system at the time Rigs 17 and 18 were being developed.  I have seen no reason to believe that wouldn't have been the case.  I did not find where the Ray report considered this system.  Id. ¶ 69.

- During my inspection of the IDS facilities I noted a simulated driller's console was being used for software testing.  IDS personnel told me they were using this system at the time Rigs 17 and 18 were being developed.  I did not find where the Ray report considered this system. Id. ¶ 70.

- Because it did not consider important test plans & results documents, the TIA portal, IDS' hardware-based simulation system for software testing, or IDS' simulated driller's console for software testing, the conclusions in the Ray report are incorrect with regards to test plans & results documents.  Id. ¶ 71

With regard to the IDS control system software, Hooper represented that IDS is currently using the TIA Portal and that he was told the TIA Portal was employed during the development of Rigs

9

17 and 18. Id. ¶ 73. Accordingly, Hooper states that Ray's conclusions and opinions regarding IDS software configuration and management are in error and not supported by evidence. Id. 74-78.

### E. EQT's Motion to Strike and for Sanctions

In the instant Motion to Strike and for Sanctions, EQT states that the cited Hooper opinions came as a surprise and that his opinions are based upon information that had been requested by EQT in the course of discovery, but not produced by Orion. ECF No. 147 at 4-6. Nonetheless, Orion produced or made this information and documentation available to Hooper. Accordingly, given the critical importance of this information to EQT's defense and counterclaim, EQT now seeks to strike all portions of the Hooper Report that rely upon the TIA Portal, IDS's hardware-based testing system and driller's console, and the IDS source code for its controller program. ECF Nos. 146, 147 at 7. EQT contends that each of these items is within the plain scope of its RFPs, as Hooper states unequivocally that software updates and testing were conducted using these items during the time period preceding delivery of the rigs to EQT.

Orion counters that all of the contested information was made available to EQT prior to litigation or during the course of discovery. Orion points to records disclosing the existence of the TIA Portal and software, as well as the simulator. See, e.g., ECF No. 198 at 2-3. Orion further states that the parties agreed to computerized search terms, and that documents were produced by it in a searchable format such that when a search for the term "TIA Portal" is made, documents bearing the term may be located. With regard to the use of a simulator to test control system programming, Orion points to information disclosed in the course of the incident investigation establishing the use of a simulator. IDS apparently made post-incident changes to the control system and used a simulator to prove the changes were effective, and then communicated its

actions to EQT's outside investigator. ECF No. 198 at 3. Orion also states that the simulator console was disclosed because a "mock drillers cabin with console" is located in the IDS conference room where EQT counsel and one of its experts met with IDS personnel.[4] Id. at 4. As to the control system source code, Orion does not dispute that it did not provide source code to EQT. Finally, with regard to a control programming management system, Orion points to deposition testimony proffered by IDS's designated corporate representative, Craig Sims, who testified regarding the PLC capability to store programming changes. Orion chastises EQT's failure to follow-up Sims' testimony with additional discovery requests. ECF No. 198 at 7.

Despite Orion's objections, at no point in the course of this litigation does it appear that Orion submitted discovery responses that identify documents responsive to the specific inquiries posed by EQT. The lapses include failing to provide information regarding whether and when the rig software or control system was tested before initial delivery to EQT, and whether and when (or how) software changes were integrated into each rig before the incidents at issue.[5]

Upon review of the extensive record now before the Court, it is apparent that Orion has produced thousands of pages of documents; however, it is also apparent that Orion has not answered relevant discovery requests propounded in any meaningful way. During the March 22, 2018, hearing on EQT's initial Motion to Compel, counsel for Orion and IDS unequivocally conceded that Orion had not segregated documents produced to correlate with any RFP (the

---

[4] At argument on the pending Motion, counsel for EQT stated that he was the attorney at issue, and disputed Orion's characterization that the mere presence of the display console disclosed the existence of a testing simulator. Rather, counsel states that IDS represented to him that the console was for "driller training." Orion counsel did not dispute this recollection, and it appears that IDS did not inform EQT that the console also was used for simulation or control testing as revealed in the Hooper report.

[5] The Court has reviewed the excerpted testimony of Craig Sims provided as an exhibit to Orion's opposition to the Motion to Strike. Mr. Sims testified that control programming changes occur in the PLC, but until the investigation of the third dropped block incident in the summer of 2016, IDS did not maintain a log of programming changes. ECF No. 212-1 at 7-11. Prior to that time, programming changes were located in the PLC, in the program itself, and could be seen if the program language was examined. Id.

"document dump") and represented that Orion was not in possession of documents responsive to EQT's requests (upon which Orion's expert report is now based). These lapses were further compounded when Orion failed to abide by direct Orders of this Court to identify and designate the previously produced documents that were responsive to each RFP and to supplement its interrogatory answers. Order, C.A. No. 16-1516 (W.D. Pa. March 22, 2018), ECF No. 98. And again, when the documents relied upon in Hooper's report came into Orion's possession, they were not produced to EQT. At oral argument on the pending Motion to Strike, Orion counsel frankly conceded that even at this late date, five weeks before trial, it has not supplemented its discovery responses to directly answer the interrogatories or RFPs at issue in compliance with the March 22, 2018 Order. Nor has Orion produced the requested source code, use of computerized control software packages, simulations, or testing to EQT.

It is clear to the Court that in formulating a theory of the case, EQT relied upon the suspected and apparent absence of a software control management system and comprehensive or organized simulated testing as major contributing factors to the dropped block incidents impacting overall rig safety. During argument on the instant Motion to Strike, counsel for Orion acknowledged initial awareness of EQT's theory of the case early in September 2018 and yet Orion failed to rectify its prior discovery lapses upon which EQT's theory is plainly predicated by timely directing EQT to or providing the relevant documents. Instead, Orion awaited the submission of EQT's expert report and then used Hooper to attack each of Ray's conclusions with information it had withheld or obfuscated with its uncorrected "document dump."

## II.    STANDARD OF REVIEW

In determining the propriety of granting EQT's Motion to Strike, the Court is guided by certain rules governing discovery through the course of litigation. Rule 26(b) of the Federal Rules

of Civil Procedure permits broad discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Rule 26(e) requires supplementation of discovery responses, and states that "[a] party who has … responded to an interrogatory [or] request for production … must supplement or correct its disclosure or response … in a timely manner if the party learns that in some material respect the … response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the parties during the discovery process or in writing."

The Court has the power to exclude evidence as a sanction for a party's failure to comply with this obligation. Specifically, Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

The party against whom the discovery sanction is sought has the "burden of proving substantial justification for its conduct or that the failure to produce was harmless." Tolerico v. Home Depot, 205 F.R.D. 169, 175 (M.D. Pa. 2002). "'Substantial justification' for the failure to make a required disclosure has been regarded as 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" Id. (quoting United States v. Dentsply Intern., Inc., No. Civ. A. 99–5, 2000 WL 654378, at *7 (D. Del. May 10, 2000). "The test of substantial justification is satisfied if

'there exists a genuine dispute concerning compliance.'" Id. at 175–76 (quoting Henrietta D. v. Giuliani, No. 95–CV–0641, 2001 WL 1602114, at *5 (E.D.N.Y. Dec. 11, 2001)).

The exclusion of critical evidence, however, "is an 'extreme' sanction, … not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." Meyers v. Pennypack Woods Home Ownership Ass'n., 559 F.2d 894, 904–905 (3d Cir. 1977) (internal citation omitted), *overruled on other grounds*, Goodman v. Lukens Steel, 777 F.2d 113 (3d Cir. 1985), *aff'd* 482 U.S. 656, 107 S. Ct. 2617 (1987). The United States Court of Appeals for the Third Circuit has set forth factors (the "Pennypack factors"), to be considered when determining whether "exclusion of evidence is an appropriate sanction for failure to comply with discovery duties:"

> (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 148 (3d Cir. 2000); see also Pennypack, 559 F.2d at 904–05. The Third Circuit has supplemented the Pennypack list, requiring consideration of (5) "the importance of the excluded testimony" and (6) the party's explanation for failing to disclose. Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997) (quoting Pennypack, 559 F.2d at 905); Vaskas v. Kenworth Truck Co., No. 10–CV–1024, 2013 WL 1207963, at *3 (M.D. Pa. Mar. 25, 2013).

## III. DISCUSSION

### A. Substantial Justification or Harmless Failure

As a threshold matter in ruling on the pending Motion to Strike, the Court must make a determination regarding: (1) whether there was a failure of discovery and (2) whether the conduct

of a party that is alleged to have failed in some discovery obligation was substantially justified or is otherwise harmless. Tolerico v. Home Depot, 205 F.R.D. at 175 (under Rule 37 "[t]he non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless.").

Orion does not dispute that the information at issue was requested but contends that the requested information was produced either before or during the course of litigation. Orion does not offer legal authority for the proposition that a limited pre-litigation exchange of partial information excuses the requirement of responding to interrogatories or RFPs under Rule 26, nor does Orion explain why it chose to ignore a Court order that it provide direct responses to discovery requests to cure an apparent and admitted "document dump." Orion further fails to explain its contradictory unequivocal written and oral representations to this Court that it did not possess information responsive to the identified interrogatories and RFPs, when in fact it possessed or had access to the information. Finally, Orion has not supplemented its responses to directly answer the contested discovery when it must have understood that it had access to the requested information when Orion provided or gave Hooper access to compiled information to draft his report. Under these circumstances, the Court cannot find the required "substantial justification" for repeated discovery lapses.

Orion further fails to establish that its failure to comply with Rule 26 and this Court's prior directive is harmless. "A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." Tolerico, 205 F.R.D. at 176 (citing Stalworth v. E–Z Serve Convenience Stores, 199 F.R.D. 366, 369 (M.D.Ala. 2001)). Orion contends that EQT somehow had access to all information upon which Hooper's conclusions are based or could have requested additional discovery based on the answers

that should have tipped off EQT to the need for more information. ECF No. 198 at 9, 10. Based on the record before the Court, however, Orion has not shown that EQT had "sufficient knowledge" of the substance or basis of Hooper's report such that it was on notice to ask additional questions or that, based upon Orion's past discovery practices, it should expect that any additional interrogatories or RFPs would be answered. Orion's production simply did not provide EQT with sufficient knowledge of the control testing and programming maintenance system, and its failure to appropriately identify documents and/or supplement discovery responses cannot be viewed as an "honest mistake" or "harmless."

### B. **Pennypack Factors**

Because there was a substantial discovery failure and Orion has failed to meet its burden of proving a substantial justification or harmlessness of its failure, the Court has discretion to exclude the Hooper expert report and testimony as it relates to the specific categories of challenged information pursuant to Rule 37(c)(1). In determining whether to exclude evidence as a sanction for failure to comply with a discovery order, the Court must consider the Pennypack factors.

#### 1. **Prejudice**

Turning to the first factor, the Court finds that portions of the Hooper Report and proposed testimony would prejudice EQT. Orion's failure to respond or supplement discovery responses as ordered in March 2018 prejudiced EQT's ability to prepare its theory of the case based upon accurate information related to the control software testing, development, and management for the rigs at issue. This clearly provided Orion with a tactical advantage, given Hooper's access to the full TIA Portal, simulator, source code and programming management and his subsequent ability to discount Ray's opinion related to these items. See Konstantopoulous v. Westvaco Corp., 112 F.3d at 721. In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 792 (3d Cir.1994) (hereinafter

referred to as "Paoli II"), the Third Circuit reversed the district court's decision to preclude expert testimony as a sanction for violations of Rule 26(b) because the prejudice to defendants was "extremely minimal." However, the Third Circuit found that the failure to timely file the required information was only "a slight deviation from pre-trial notice requirements, and admitting the witness was likely to cause only a slight prejudice to the defendants, who were already aware of the basic substance of the witness' testimony." Paoli II, 35 F.3d at 792. Here, Orion's repeated failure to adequately respond to discovery requests or to supplement its earlier responses as ordered in March 2018 or after documentation and access were provided by Orion to Hooper is more than a "slight deviation" from required Rule 26 disclosures and clearly resulted in an apparent inaccurate and incomplete understanding of the computerized control system for both rigs. Moreover, Orion obtained a tactical advantage by its disregard of the Court's Order to correct discovery lapses and its repeated statements that Orion did not possess the requested information, leading to EQT's incomplete understanding of the control software management and pre-sale testing activities. The Court finds that this factor substantially weighs in EQT's favor.

### 2. Cure and Disruption

EQT contends that with the trial of this matter just weeks away, the substantial prejudice resulting from Orion's discovery conduct cannot be cured. During oral argument on the Motion to Strike, Orion disputed this characterization, and stated that EQT and Ray may be provided immediate access to IDS's control programming environment and simulator, such that a new report may be crafted. Orion further offered to waive the opportunity for additional depositions should the examination result in changes to Ray's report.

The Court has considered Orion's proffered cure and finds it wanting for a number of reasons. As indicated, trial is currently scheduled to begin January 14, 2019, just five weeks from

today. The parties have filed pre-trial statements identifying well over three dozen witnesses; proposed voir dire and jury instructions predicated upon EQT's theory of the case have been filed, as have nearly a dozen motions in limine and assorted trial briefs. Should the Court reschedule the trial of this matter to permit additional discovery and time for EQT to reformulate its case if necessary, each of the parties' filings will likely need to be redrafted to account for the withheld information and resulting changes in case theory. Further, Ray is not the only expert impacted by the challenged information. EQT has also engaged the services of an engineering expert. A cursory review of the engineering report reveals that the challenged information is equally and necessarily implicated. As such, an opportunity to cure would result in substantial burden upon and significant expenses for EQT, including but not limited to: review of the documentation and data that Orion withheld, potentially reopening certain depositions of Orion and IDS personnel, travel to Texas by EQT experts and counsel for site visits and analysis of the TIA Portal, hardware testing, simulations with the drillers console, and IDS source codes, issuance of revised EQT expert reports, re-deposition of Hooper, revision and refiling of EQT's pretrial statement and related motions in limine. Further, in terms of scheduling, the Court's current docket of other civil cases and scheduled criminal proceedings would require a delay of at least nine months to allot the estimated four weeks necessary for the trial of this matter. In the face of these troubling circumstances, an opportunity to cure will require the expenditure of substantial costs for EQT and unquestionably disrupt the administration of justice and trial proceedings in this matter. These factors weigh in EQT's favor.

### 3. Willful Dereliction

The Court has taken pains to describe Orion's initial failure to adequately respond to discovery requests as required by Rule 26, as well as Orion's consistent representations to EQT

and to the Court that it was not in possession of the subject information. The Court has also explained the underlying conduct necessitating the Orders entered on March 22, 2018, to cure Orion's discovery lapses, and Orion's later failure to supplement its responses once it came into possession of the requested information. While the Court does not find that counsel acted in "bad faith," it is clear that Orion and IDS willfully refused to provide EQT the source code or coherent and direct information regarding control system programming and management. It is also clear that Hooper's report evidences the clear tactical advantage this approach earned by utilizing the withheld information to discount much of Ray's opinions regarding the central issue of rig safety. This factor weighs in EQT's favor.

### 4. Importance of Excluded Information

The parties do not meaningfully dispute the importance of the evidence to the proffering party and this factor weighs against granting EQT's motion to strike. However, it seems worth noting that, given the importance of the information to establish that the Rigs were safe to operate after programming changes were implemented, it is difficult to understand Orion's persistent and willful failure to produce the requested testing, source code, simulations, and programming change management system information.

### 5. Explanation for Conduct

Orion has not explained its conduct, beyond arguing that a portion of the requested information was given to EQT's outside investigator prior to the commencement of litigation, when the parties were evaluating the cause of the dropped blocks on Rig 18. Orion also casts blame on EQT for failing to proffer additional discovery requests that may have led to the originally requested information and/or failing to discern that a representation that a driller training console was also a much-used control-program simulator and/or failing to run searches for terms

with undisclosed relevance. However, in the face of Orion's failure to appropriately respond or supplement its discovery responses or correct statements that it was not in possession of the requested information and Orion's repeated failure to comply with Fed. R. Civ. P. 26(e), Orion's explanation falls flat, and this factor weighs in favor of EQT.

In sum, Orion has demonstrated a pattern of repeated discovery dereliction, and willfully ignored Court Orders that most certainly led to the situation presented at this late hour. Had Orion complied with Rule 26(e) and the applicable Court Orders, the instant issue would not be before the Court on the eve of trial. As previously noted, "the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." Konstantopoulos v. Westvaco Corp., 112 F.3d at 719 (internal citations omitted). Based upon Orion's conduct of discovery to its tactical advantage, including the "flagrant disregard" of this Court's Orders and utter disregard of Rule 26(e), this is a situation where exclusion is appropriate. Accordingly, the Motion to Strike shall be granted and the Court will enter an Order striking those portions of the Hooper Report that rely upon the TIA Portal and its test, simulation, and compare functionalities, IDS's hardware-based testing system and driller's console (for simulation testing purposes), and the source code for the IDS control system. Orion is further precluded from offering at trial any opinions or testimony by Hooper or any other witness or exhibits as to those items that have been stricken. Orion is further prohibited from presenting Hooper in its case in chief with regard to the stricken items. Finally, EQT shall be awarded attorneys' fees and costs associated with the filing and argument of the pending Motion to Strike and for Sanctions.

## C. ADC Report and Termination Letters

EQT also seeks the exclusion of testimony through Hooper regarding the substance of EQT's Termination Letters and the reports prepared on its behalf by Aberdeen Drilling Consultants ("ADC"). EQT contends that such testimony is improper rebuttal because none of its experts addressed the Termination Letters, and Orion has been in possession of the ADC Reports "since well before its case-in-chief expert reports were due," and such information should have been anticipated and presented in Orion's case-in-chief. ECF No. 147 at 12-13. Orion responds that the ADC Reports constitute EQT's expert opinion regarding certain of the alleged engineering or manufacturing defects contributing to the safety of Rigs 17 and 18, and that the Termination Letters recite and rely upon the conclusions set forth in the ADC Reports. ECF No. 198 at 12.

The rules governing the scope of rebuttal testimony were the topic of dispute in Fed. Trade Comm'n v. Innovative Designs, Inc., No. 2:16-CV-01669, 2018 WL 3611510 (W.D. Pa. July 27, 2018), where the Court granted the FTC leave to file a sur-rebuttal expert report despite IDI's contention that the information contained therein was improper because such evidence should have been presented in the FTC's case-in-chief.

> This Court has wide discretion in determining what evidence may be presented on rebuttal. See United States v. Chrzanowski, 502 F.2d 573, 576 (3d Cir. 1974). Fed. R. Civ. P. 26(a)(2)(D)(ii) defines rebuttal experts as presenting "evidence [that] is intended solely to contradict or rebut evidence on the same subject matter identified by another party ..." See also Withrow v. Spears, 967 F.Supp.2d 982, 1002 (D. Del. Aug. 22, 2013) ("expert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports."). While the scope of a rebuttal report is limited to the same subject matter encompassed in the opposing party's expert reports, district courts have been reluctant to narrowly construe the phrase "same subject matter" beyond its plain language. See, e.g., Pritchard v. Dow Agro Scis., 263 F.R.D. 277, 284 (W.D. Pa. 2009) (finding declaration did not include any new opinions but rather served to further elaborate upon the initial opinions expressed in the report and rebut the defense experts' opinions); Safe Auto Ins. Co. v. State Auto. Mut. Ins. Co., No. 2:07-CV-01121, 2009 WL 10679570, at *2 (S.D. Ohio Mar. 4, 2009); TC Sys., Inc.

v. Town of Colonie, New York, 213 F.Supp.2d 171, 180 (N.D.N.Y. 2002) (stating that the court "is reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language" because doing so would "impose an additional restriction on parties that is not included in the Rules").

The term "same subject matter" is not defined in the Advisory Committee Notes to Rule 26 and there is little case authority on the issue. See Safe Auto Ins. Co., 2009 WL 10679570, at *2; TC Sys., Inc., 213 F.Supp.2d at 180. However, the courts that have interpreted the term "same subject matter" in this regard have done so broadly, requiring that a rebuttal report simply address the same topic as the affirmative report, as opposed to the same topic and methodology the affirmative expert relied on.

Id. 2018 WL 3611510 at *2-3. In this instance, EQT identified the ADC Reports as its expert reports on September 15, 2018. ECF Nos. 198-28 and 198-29. The ADC Reports and Termination Letters raise software control, engineering, and mechanical concerns regarding the cause(s) of the dropped block incidents and remediation; the open or unresolved Corrective Action Requests; and the absence of pre-service/delivery testing of the Rigs' operating systems. These topics are raised by EQT's experts in support of EQT's contention that Orion materially breached the drilling contracts by conducting operations with unsafe equipment. While such topics could have been anticipated, they would not necessarily be raised in Orion's case-in-chief for breach of contact. As such, to the extent not otherwise barred, these items are appropriate subject matter for rebuttal. EQT's Motion to Strike Hooper's Report as it refers to the ADC Reports or the Termination Letters therefore is denied to the extent such testimony is not otherwise barred by the foregoing Opinion and accompanying Order.

## IV.    CONCLUSION

For the foregoing reasons, EQT's Motion to Strike and for Sanctions is granted in part and denied in part. Accordingly, the following Order is entered:

# ORDER

AND NOW, this 11th day of December, 2018, upon consideration of EQT's Motion to Strike and for Sanctions, ECF No. 146, and the briefs and exhibits in support and in opposition thereto, ECF Nos. 147, 198, and 206, and for the reasons set forth in the foregoing Opinion,

IT IS HEREBY ORDERED that the Motion to Strike and for Sanctions is granted in part and denied in part, as follows:

Orion Drilling Company, LLC, is precluded from offering at trial portions of the Expert Report of Richard Hooper, Ph.D, PE, dated October 9, 2018, and testimony by Richard Hooper or any other witness, regarding the following items:

1. the TIA Portal and its test, simulation, and compare functionalities,

2. IDS's hardware-based testing system,

3. IDS's driller's training or simulation console, and

4. the source code for the IDS control system.

IT IS FURTHER ORDERED that Richard Hooper is precluded from testifying in Orion's case-in-chief with regard to these items.

IT IS FURTHER ORDERED that EQT's Motion to Strike Dr. Hooper's use of the ADC Reports and/or Termination Letters is denied as to subjects not otherwise barred by this Order.

IT IS FURTHER ORDERED that Orion shall compensate EQT for reasonable attorneys' fees and costs associated with preparing, filing and arguing the Motion to Strike and for Sanctions.

Dated: December 11, 2018

BY THE COURT,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record via CM/ECF