# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ORION DRILLING COMPANY, LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 16-1516** |
| | ) | **Magistrate Judge Maureen P. Kelly** |
| **v.** | ) | |
| | ) | **Re: ECF Nos. 371 and 373** |
| | ) | |
| **EQT PRODUCTION COMPANY,** | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

**KELLY, Magistrate Judge**

This action was commenced by Plaintiff Orion Drilling Company, LLC ("Orion"), against Defendant EQT Production Company ("EQT"), alleging that EQT breached a series of contracts pursuant to which Orion agreed to build and operate two drilling rigs at various EQT well sites for a specified number of days. After a two-week jury trial, the jury rendered a verdict in favor of EQT as to the claims asserted against it.[1]

Presently before the Court are Orion's Motion for New Trial Pursuant to Rule 59, and its Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b). ECF Nos. 371, 373. Upon consideration of the parties' submissions in support of and in opposition to both Motions, ECF Nos. 372, 374, 385, 386 and 388, and for the following reasons, Plaintiff's Motion for New Trial Pursuant to Rule 59 and Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) are denied.

---

[1] The trial ran from 9:00 a.m. to 4:00 p.m. each weekday, with counsel arguing objections and motions to the Court most days beginning at 8:00 a.m. and after trial until 5:30 p.m. The trial included two hours of openings, two hours of closing arguments, approximately 138 exhibits, and 16 fact and expert witnesses. ECF Nos. 326, 327. There were ten jurors, each of whom were provided a notepad to take notes throughout the trial, a copy of the Court's final jury instructions, and a copy of the verdict slip.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

The facts as set forth in the pleadings and as presented during trial, and viewed in the light most favorable to EQT as the verdict winner, are as follows.

Orion and EQT are two sophisticated business entities, each operated by individuals with decades of experience in the oil and gas industry. Beginning in 2014, the parties entered into a series of contracts related to gas drilling operations using two rigs constructed by Orion, identified as Rig 17 and Rig 18. The pending litigation arises from fundamental differences in the interpretation of provisions governing termination of these contracts.

## A.  The Contracts

On August 4, 2014, with regard to Rig 17, and on August 6, 2014, with regard to Rig 18, the parties adopted a form International Association of Drilling Contractors ("IADC") Drilling Bid Proposal and Daywork Drilling Contract ("Drilling Contract"), as supplemented with IADC standard exhibits. ECF No. 1-3, 1-5. In both agreements, EQT is identified as the "Operator" and Orion is identified as the "Contractor." The principal agreements were modified to incorporate certain "early termination" provisions set forth in form Exhibit A; however, no changes were made to provisions regarding termination for contractor default, or to remove otherwise available equitable remedies. For ease of reference, the Drilling Contracts (as amended) provide as follows:

**6:  TERM**

**6.1  Duration of Contract:**  This Contract shall remain in full force and effect until drilling operations are completed on the well or wells specified in Paragraph 1 above, or for a term of 1095 days of activity including standby, moving and/or operating days (excluding any days affected by a Force Majeure Event) commencing on the date specified in Paragraph 2 above.

**6.3  Early Termination by Contractor:**  See "Exhibit A, Other Provisions" Item 7.3.

~~(a)  By Either Party:  Upon giving of written notice, either party may terminate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitates stopping operations hereunder.~~

~~(b)  By Operator:  Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder.  In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.~~

~~**(c)  By Contractor:**~~  Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract ~~and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof~~, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed.  ***In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners ….***

**6.4  Early Termination Compensation:** See "Exhibit A, Other Provisions" Item 7.3.

~~(a)  Prior to Commencement:  In the event Operator terminated this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty a sum equal to the standby time rate (Subparagraph 4.6) for a period of ___ days or a lump sum of $ ____.~~

~~(b)  Prior to Spudding:  If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment provided, however, if this Contract is for a term of more than one well or for a period of time, Operator~~

~~shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or~~

~~**(c)   Subsequent to spudding:**  If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for _____ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus a lump sum of $____ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or _____.~~

## 6.5  TERMINATION

**(1)    Project Termination for Default –** Contractor shall be deemed in default under and in breach of this Contract whenever Contractor shall:

**(A)**    Suffer voluntary or involuntary bankruptcy.

**(B)**    Make a general assignment for the benefit of its creditors.

**(C)    Become insolvent or** have a receiver appointed for it on account of insolvency.

**(D)**    Fail to supply sufficient labor and materials or to make adequate provision for the timely performance of the work to perform its obligations hereunder with due diligence in a good and workmanlike manner in accordance with industry standards, practices and procedures which would be reasonably expected from an experienced contractor in the drilling industry by Operator and does not cure failure within 7 days of Operator's written notice.

**(E)**    Fail to make prompt payment when due to its subcontractors and suppliers for material or labor.

**(F)**    Fail to comply with requirement or material provision of this Contract in accordance with industry standards and does not cure failure within 7 days of Operator's written notice.

**(G)**    Violate or allow a violation of any law or regulation applicable to the performance of its work and does not cure failure within 7 days of Operator's written notice.

**(H)    Continuously violate Operator's safety, environmental, controlled substances or other applicable rules and policies in any material respect for 7 days and fail to cure the violation within 7 days of the date of Operator's written notice.**

**(I)**    Permit any performance, security or insurance policy required to be maintained by this Contract to be suspended or canceled without

Contractor's providing replacement coverage; or upon the insolvency of the issuing financial or insurance institution, to fail to provide an immediate replacement performance, security or insurance policy.

**(2)** In the event of a default by Contractor under Paragraph 1 above, Operator shall have the right:

**(A)** To remedy the Contractor's deficiency and deduct a reasonable cost thereof from any payment then or thereafter due to the Contractor and does not cure within 7 days of Operator's written notice;

**(B)** To terminate the Purchase Order and/or this Contract for the work or any part thereof and complete the work by whatever method the Operator deems expedient. Contractor hereby specifically authorizes Operator to undertake and charge the cost thereof to Contractor of Operator (1) completing the work itself with labor and materials priced at the prevailing rates with proper allowances for profit and overhead; (2) agreeing with others, through one or more contracts, to finish the work at such prices and on such terms and conditions as Operator deems advisable in its sole discretion; or (3) to finish a portion of the work itself and to contract with others to finish the remaining portion of the work. Operator will be responsible for equipment and tool maintenance during this time period of possession.

**(C)** To pursue any other remedy provided under this Contract or available at law or equity. Exercise by Operator of any such remedy or right shall not be an election of remedies nor restrict Operator's right to assert any other available right or remedy, nor operate to relieve Contractor of further liability and any and all damages sustained by reason of Contractor's default, unless and only to the extent expressly provided otherwise in this Contract. Operator shall have the right to repurchase any equipment originally purchased by itself and added to the Contractor's rig to augment or improve rig efficiency on or before the end of term at pricing less than amortization included in day rate.

In relevant part, **Exhibit A** to each contract provides as follows:

**7. OTHER PROVISIONS**

**7.1 Term**

This contract applies to the rig identified in Section 4.1 of Exhibit A and shall be for a term ending (a) 1095 days from the date this rig begins daywork for this Operator or (b) upon rig release from the well being drilled on such 1095th day, whichever is later. The Operator acknowledges that it is contracting to obtain and pay for the services of such rig for the entire term of this contract, except as provided in Section 7.4. above.[2] Operator may at its sole discretion extend the term of the Agreement within eighteen (18) months of the Commencement Date

---

[2] Orion contends that the reference to "7.4" is a "scrivener's error," and that in the absence of a corresponding provision at 7.4, it is clear that the parties meant to refer to § 6.4, the principal contract provision for Early Termination Compensation, which Orion contends is further amended by Exhibit A, item 7.3. ECF No. 372 at 2.

for a period of twelve (12) additional months at the day rate specified below in Section 7.16.

## 7.3 Early Termination

Operator shall have the right to termination (*sic*) this contract at any time after the date of execution by giving written notice of the effective date of cancellation at least thirty (30) days in advance, provided that the Operator pays Contractor the early termination amount as specified below.

In the event of early termination by Operator after execution of this contract, operator shall pay to Contractor as liquidation damages and not as a penalty, a lump sum equal to $20,000 for each of the remaining days in the contract term early termination amount. Operator shall pay this lump sum early termination amount within 30 (thirty) days of the invoice date. Further, all other amounts due and owing under this Contract, including without limitation, the mobilization and demobilization payments, shall be paid pursuant to the provisions set out in this Contract. Notwithstanding the forgoing, Operator shall not be required to pay an early termination amount if Operator elects to terminate this Contract based upon one of the following events:

(a) The rig is deemed a total or constructive loss or a major breakdown occurs with an indefinite repair time and Contractor has not substituted a rig capable of substantially the same performance within 30 (thirty) days of the date of Operator's written demand for a substitute rig.

(b) The Contractor suffers involuntary or voluntary bankruptcy, is insolvent or subject to receivership or similar insolvency proceedings.

(c) If Contractor fails to materially perform its operations hereunder with reasonable due diligence in a good and workmanlike manner generally in accordance with the industry standards, practices and procedures which would be reasonably expected from an experienced contractor in the drilling industry and does not cure such failure within 50 (fifty) calendar days of the date of Operator's written notice to Contractor of such failure.

If Operator terminates this Contract in the case of (b) or (c) above, Contractor shall be entitled to the amount then due and owing under this Contract prior to the effective early termination date in accordance with the payment terms in this Contract, plus reasonable mobilization and demobilization costs to a mutually agreed location in Pennsylvania. If Operator terminates this Contract in the case of (a) above, Contractor shall be entitled to the amounts due and owing under this Contract as of the date rig is deemed a total or constructive loss or the date the rig suffers a major breakdown with an indefinite repair time, plus mobilization and demobilization costs to a mutually agreed location in Pennsylvania.

**Exhibit C** to each Drilling Contract sets forth Additional Responsibilities of Contractor, and provides in pertinent part:

> 15. Contractor shall be fully responsible for development and implementation of its workplace safety policies and procedures for its employees or agents and shall not rely upon any guidelines, policies or procedures of Operator. Operator reserves the right to audit contractor's compliance at any reasonable time with all EHS laws, regulations and policies including but not limited to, contractor's written safety program, employee training records and accident reports/logs. Operator reserves the right to shut down an operation if material non-compliances or other unsafe conditions are observed. Failure of operator to shut-down an operation does not indicate a determination of compliance or safety by the Operator or for any other purpose. Notwithstanding any provisions or actions of Operator, Contractor acknowledges its responsibility and obligations for all safety matters and agrees that it is not relying on Operator in any manner.

Orion argues that pursuant to the provisions set forth above, Rigs 17 and 18 were subject to "take or pay" agreements that require the payment of liquidated damages in the event of termination prior to the expiration of the designated term, regardless of cause or reason. In support of its position, Orion points to the incorporation of Exhibit A, Sections 7.1 and 7.3, and the striking of Section 6.4 in the primary agreement. EQT argues that the parties intended to permit termination for default pursuant to Section 6.5, which was retained in the primary agreement, and which preserved the ability to terminate without payment of liquidated damages in the event of persistent safety concerns that remained uncured after 7 days. In addition, EQT contends that Section 6.5(2)(C) specifically preserves all other remedies available under the Drilling Contracts and at law and equity. Through this provision, the parties maintained EQT's right to shut down unsafe operations and to terminate the contract for material breach and default without providing an opportunity for cure or payment of liquidated damages.

### B. Performance and Termination

The evidence presented at trial established that in 2015 and 2016, both Rig 17 and Rig 18 experienced "dropped block" incidents. A dropped block is "an uncontrolled descent" of

approximately 50,000 pounds of the drill's top drive, traveling block, and associated equipment in the mast, ECF No. 331 at 204-05. Wayne Squires, Orion's Chief Executive Officer and President, conceded at trial that such incidents raise significant safety concerns for the lives and well-being of any contractors or employees working on the drilling platform below. ECF No. 379 at 52, 184. David Castro, Orion's Vice President for Health, Safety, and Environment testified that in the years he spent working for several other oil companies in safety-related roles, he had never dealt with a dropped block incident, and that such incidents have the potential to be fatal if the underlying causes are not corrected. ECF No. 353 at 26-27, 64.

The peril and rarity of a dropped block event was confirmed by Craig Sims, the Vice President of Business Development for Integrated Drive Systems ("IDS"), designer of the Rig 17 and Rig 18 control system, who reported the first dropped block event to IDS leadership indicating "we are lucky someone wasn't hurt," ECF No. 331 at 76-77; ECF No. 368-7; by Karl Van Camp, Orion's independent rig commissioning inspector, who testified that a dropped block is extremely rare, potentially fatal, and that he had never heard of a rig experience more than one dropped block incident prior to being retained by Orion, ECF No. 331 at 154, 178-179; by Brett Schellenberg, Orion's General Manager, who testified that before being employed by Orion, he had never heard of a rig that experienced multiple dropped blocks, and that such events were classified as "high potential" events, that could result in injury or significant equipment damage, id. at 205; by Matthew Tonder, a consultant retained by Orion, who testified that in his 25 years in the drilling industry, he had never worked on a rig that experienced a dropped block incident, and had never heard of a rig experiencing three such incidents; Tonder further agreed that a dropped block incident has "the potential to kill someone," id. at 144-45, 146; by Owen Brandt, Orion's Operations Manager and Rig Superintendent for Rigs 17 and 18, who testified that prior to working

on these rigs, he had not experienced a dropped block on any other Orion rig, and had never heard of another rig that dropped its block three times, ECF No. 359 at 7.

Rig 18 experienced three dropped block incidents during operations on behalf of EQT: September 25, 2015, October 10, 2015, and June 7, 2016. The September 25, 2015, incident was described by Sims as "an out of control condition of the control system" compounded by the failure of an emergency brake, which did not prevent the block from hitting the drilling platform floor. ECF No. 331 at 76-77. On September 30, 2015, EQT sent a notice of default referencing Section 6.5(1)(F) of the Rig 18 Drilling Contract and demanded formal documentation of a cure within 7 days. ECF No. 379 at 195; ECF No. 367-10. The notice identified the dropped block incident as a material failure, "resulting in a significant near miss on the drilling floor," which "thankfully did not result in fatalities." ECF No. 367-10. The letter advised that "[i]f Orion fails to cure these Rig failures to EQT's satisfaction, or there are additional failures in Orion's operation of or the performance of the Rig (related to the IDS drilling system or otherwise), EQT may elect to exercise its contractual termination rights under the Drilling Contract." Id.

Squires responded on behalf of Orion within the Drilling Contract's 7-day cure period and represented that Orion had identified the cause of the dropped block incident and cured the fault. ECF No. 379 at 196. Orion repaired a drill string, made changes to bridge protection parameters, tested the brake system, and provided additional training to platform engineers. Id. at 196-97. Despite Orion's representations that these measures were sufficient to ensure safe operation of Rig 18, a second dropped block incident occurred on October 10, 2015, when the block again suffered uncontrolled descent and the braking system failed to engage. ECF No. 331 at 37-38.

EQT ordered a stoppage of drilling operations and notified Orion that the incident constituted default of the Rig 18 Drilling Contract pursuant to Section 6.5. EQT stated that as

evidenced by the second incident, Orion had failed to correct the defect that caused the September rig failure. ECF No. 355 at 14-15; ECF No. 367-12. Upon investigation into the cause of the second incident, Orion and IDS determined that a programming error had been entered into the control system which allowed the drill speed to run faster than it should have for the given weight. ECF No. 331 at 37-38. Orion and IDS further determined that this error was likely the cause of the first dropped block incident in September. ECF No. 379 at 198. Squires conceded that the repairs conducted after the first incident were necessary, but not related to the September 2015 incident. Squires represented to EQT that the programming errors were remedied and that these changes would prevent similar occurrences in the future. Id. at 198-199. Squires further disputed EQT's contention that the incidents, which Orion characterized as equipment "malfunction," gave rise to default under the controlling contract or violated industry standards. ECF No. 367-13.

On October 26, 2015, the parties entered into a "Third Amendment to the IADC Daywork Drilling Contract" for Rig 18, whereby Orion agreed to conduct further testing of Rig 18 at its sole expense and to indemnify EQT for any claims arising from the "loss of safe block motion control" during a test period and for thirty days thereafter. ECF No. 367-14. Orion granted EQT the right to immediately terminate the Drilling Contract "without any penalty or obligation for any liquidated damages, and early termination payments" in the event of an additional incident during this extended testing period, and the parties agreed to preserve "all other terms and provisions of the Contract, and each party's respective rights and remedies" which "shall remain in force and in effect between the parties." Id.

Just two weeks later, on November 6, 2015, EQT provided notice to Orion of its dissatisfaction with "the continued accumulation of safety incidents and nonproductive time on both Orion Rig 17 and Rig 18." ECF No. 367-15. The notice conveyed EQT's belief that "[m]any

of these issues appear directly related to the IDS operating system or are premature equipment failures of critical components necessary to efficiently and safely execute our drilling program. Rig 17 and Rig 18 combined are averaging 8% NPT [Non-Production Time] from start up until this week. This is 5 times higher than the 1.6% average of the other 7 rigs in our fleet. The rigs together have averaged 347 hours of NPT, which is 3.5 times higher than the average of the other 7 rigs in our fleet, which have averaged only 99 hours." Id. This notice did not invoke the termination provisions under either Section 6.5 or Section 7.3 of Exhibit A to the Rig 18 drilling contract, but was intended to document EQT's frustration with Orion's lack of response to issues arising in the field. ECF No. 355 at 61; ECF No. 353 at 111-12. EQT sent a second letter outlining similar issues to Orion on November 16, 2015. ECF No. 367-16; ECF No. 379 at 128-29.

Orion responded to EQT's correspondence, and acknowledged its agreement "that IDS's equipment has been the leading cause of downtime on our rigs. It is our belief that the majority of these issues have been resolved or are in the works to be resolved. We would like to be clear that it is not the intent of Orion or IDS to work out bugs related to the IDS system while on EQT time. With that in mind, we have worked with IDS to create a robust data tracking system in an effort to prevent future NPT incidents from occurring." ECF No. 367-17; ECF No. 379 at 129-30, 192.

After an exchange of letters in late 2015 and early 2016 addressing additional NPT and equipment failures, EQT sent written notice of default pursuant to Section 6.5(1)(F) of the Drilling Contract with regard to both rigs, and requested cure within 7 days. ECF No. 367-20; ECF No. 367-21; ECF No. 379 at 131. Orion again denied the applicability of Section 6.5 to the ongoing issues but, on March 2, 2016, agreed to credit EQT the sum of $279,834.65 of a total claim of $559,669.29 in damages sustained by EQT as a result of costs incurred and lost production time and delayed drilling operations. ECF No. 379 at 131-133; ECF No. 367-20, 367-23. By way of

the "Settlement and Release Agreement," and in exchange for the credit, EQT agreed to release and discharge Orion "of and from any and all claims, liabilities, damages, costs, offset entitlements, demands, expenses and/or causes of action arising from or pertaining to [alleged defective drilling operations, rig, failure to comply with requirements of the drilling contract, and resulting non-productive time in the performance of drilling operations on EQT wells]." ECF No. 367-23.

Despite Orion's representations that it had cured the defects with the IDS control system after the second dropped block incident, Rig 18 suffered a third dropped block on June 7, 2016. Squires testified that the cause of this event was a Bonitron failure. ECF No. 379 at 135-136. However, it became apparent that the IDS control system was not programmed to set the brake in the event of a Bonitron failure and as a result, the block dropped unexpectedly and the brakes failed to engage. Id., at 200-01; ECF No. 367-24; ECF No. 356 at 33-36. Orion's incident report indicated as follows:

> The driller reported that he heard the drawworks wind up and immediately applied the mechanical drawworks brakes (Witchita) by putting the controls into park position, which slowed downward descent of the block, but the brakes were not able to completely stop the drawworks due to rapid downward momentum at 278 FPM[] (based off of witness statements and Pason data). Personnel working on the floor at the time of incident evacuated the area before elevators came to rest on rotary table. The CRT was stacked out on the top of the elevators, and the drill line had slack in it. No injuries were sustained as a result of this incident.

ECF No. 367-24; ECF No. 331 at 106-07. On June 9, 2016, EQT sent Orion a written notice of default pursuant to Section 6.5 of the Rig 18 Drilling Contract and instructed Orion to shut down all drilling operations for safety reasons. At trial, Squires conceded that EQT was permitted to cease operations under the Rig 18 contract. ECF No. 379 at 137-38, 200-01. EQT's default notice cited "material unsafe conditions observed in the operation of the Rig." Id. In addition, EQT stated:

[It] afforded Orion ample opportunities to diagnose and repair the Rig following the prior block dropping failures, yet the Rig remains manifestly unsafe in its current operation condition. EQT cannot allow continued operation of the Rig due to the significant potential for accidents and the danger posed to drilling personnel. EQT hereby instructs Orion to pull the last joint of casing out of the hole and lay it down, and pick up the 5 ½" landing joint and land the casing in the wellhead. Orion will immediately rig down upon completion of this procedure. EQT will then arrange to demobilize the Rig from the West Run well pad to the Orion yard in Dubois, Pennsylvania or a similar mutually agreed location for Orion to perform diagnostics and repairs while EQT completes its drilling operations on the West Run well pad with another rig.

EQT hereby requests that Orion perform a formal investigation and root causes analysis of this latest block dropping failure. The shut down and suspension of Rig operations will continue until Orion has: (1) delivered and presented to EQT a report with the final results and findings of such investigation and analysis, (2) demonstrably corrected and repaired all Rig failures, and (3) delivered to EQT a written certification from an independent safety engineer approved by EQT certifying that Orion has satisfactorily completed all repairs and undertaken all preventative measures necessary to guaranty the safe operation of the Rig.

ECF No. 367-25. On June 16, 2016, the parties entered into a Letter Agreement documenting the steps to be taken by Orion to address EQT's stated concerns for the safety of its employees and contractors. ECF 367-28; ECF No. 379 at 201. Squires testified that he agreed to shut down Rig 18 and to permit Aberdeen Drilling Consultants, Ltd. ("ADC"), an independent safety engineering firm selected by EQT, to investigate and to identify preventative measures and repairs. Id. In addition, Squires agreed that Orion would complete any repairs or preventative measures identified by ADC "to the satisfaction of EQT." Id. For purposes of conducting the inspection, the parties agreed "to extend the cure period specified in paragraphs 6.5(1)(F) and 6.5(1)(H) of the Drilling Contract" to "end at 5:00 pm on July 9, 2016, or seven days after the written assessment … is delivered to Orion, whichever date is later." ECF No. 367-28. The Letter Agreement provided that if Rig 18 was placed back into service on EQT's behalf, Orion would indemnify and hold harmless EQT for any liabilities or claims arising out of any other uncontrolled block movement for one year after return to service. The parties further agreed that in the event of litigation:

> This letter agreement shall not affect or limit Orion's position that (a) all claims relating to the prior incidents referenced in EQT's letter of June 9, 2016 were settled and released for all purposes by the Agreement between the parties dated March 2, 2016, (b) the provisions of Section 6.5 are not applicable to the subject matter of this letter agreement, and (c) Orion has satisfied the contractual requirements of Section 6.5 with respect to the subject matter of this agreement with its previous responses. This letter agreement also shall not affect or limit EQT's contrary position regarding (a), (b), and (c).

Id.

Squires testified that ADC's report identified 11 nonconformance issues and made several key conclusions that raised serious concerns with the safety of the hardware and software of the IDS control system. ECF No. 379 at 202-03; ECF No. 367-31. In particular, ADC concluded that there was additional concern regarding the interaction of the various rig systems and components within the hardware and software of the control system. Id. ADC further determined that in the absence of a Failure Modes Effect Analysis ("FMEA") to help identify additional dormant faults that may reside within the software and hardware of the control system, "it cannot be confirmed that all envisaged failure modes have been adequately investigated and addressed." ECF No. 379 at 203-04; ECF No. 367-31.

David Elkin, EQT's Senior Vice President for Drilling & Completions, reviewed the report and was concerned that, based upon ADC's review of the control system and the happening of three highly unusual dropped block incidents, ADC determined that "even if [Orion did] everything that they [ADC] outlined in the report … they weren't sure that any amount of testing that they were prescribing in the report was going to ensure that the rig could operate safely." ECF No. 353 at 129-30.

On July 8, 2016, EQT notified Orion that in accordance with its rights under Section 27.2 and Exhibit C, Paragraph 15 of the Rig 17 Contract, and because of ongoing safety concerns with the IDS software and hardware control system utilized by both Rig 18 and Rig 17, EQT "believes

it is necessary for health and safety protection and because of material unsafe conditions to shut down operation of Rig 17." ECF No. 367-32.

Orion informed EQT that it corrected the Rig 18 critical and major nonconformance issues identified in the ADC report by July 11, 2016, and tendered the rig for inspection by EQT. ECF No. 367-33. However, Orion did not represent that it had undertaken an analysis and testing of the control system for latent defaults that could cause another dropped block incident. Elkin, on behalf of EQT, cited this lapse in tender as a violation of the June 16, 2016 Letter Agreement, whereby Orion agreed to complete "any and all identified … preventative measures to the satisfaction of EQT and ADC." ECF No. 353 at 137-38; ECF No. 367 at 34. Because Rig 17 employed the identical IDS control system, Elkin informed Orion that Orion's failure to assess the control system for "additional dormant faults" required that Rig 17 be shut down, given the number of dropped block incidents on Rig 18 "because of unidentified faults." Id. Despite EQT's directive, Orion "refused to shut down" Rig 17. ECF No. 353 at 136.

On July 12, 2016, Orion stated it would conduct the requested FMEA and remedy any failures identified therein, and would apply all changes identified to Rig 17. ECF No. 367-35. In addition, it would complete this inspection and tender Rig 18 in two days, on July 14, 2016, within the cure period set forth in the Letter Agreement. Id. Orion submitted its FMEA report to EQT on July 15, 2016, along with documentation stating it had cured the identified nonconformances. ECF No. 353 at 138; ECF 367-36. EQT forwarded the documentation to ADC to review and requested that ADC provide EQT an opinion regarding Orion's proposed corrective action. Id.

On July 15, 2016, EQT formally notified Orion of Orion's default of the Rig 17 Drilling Contract pursuant to Section 6.5, and its failure to "materially perform its operations in a workmanlike manner and in accordance with industry standards, practices and procedures under

Exhibit C, Section 7.3 of the Rig 17 Contract." ECF No. 367-37. Elkin testified that because the software and control system were identical, EQT had serious safety concerns regarding Rig 17's continued operation. ECF No. 353 at 139-40. In addition, Rig 17 had experienced "a number of other HSE incidents … and it was our opinion that Rig 17 could not be operated safely as well." Id. EQT's notice identified 16 serious safety incidents on Rig 17, including erratic brake operation and at least one instance where the brakes did not engage, resulting in a dropped block. Id.; ECF No. 353 at 145. The notice further referenced ADC's conclusion from the Rig 18 report that "*it is unlikely that additional testing would determine all potential system-based failures.*" ECF No. 367-37 (italics in original).

On July 25, 2016, ADC completed its review and submitted a Final Report to EQT. ECF No. 353 at 141; ECF No. 367-42. Elkin testified that ADC was concerned that the FMEA control system testing had been conducted on a simulator in Houston, not on the rig itself, and this seriously impacted the reliability of Orion's analysis. Id. ADC reported that "[u]tilizing this method does not give full confidence that the rig's systems will act in the same manner, nor does it indicate that the software has been changed or tested on the rig as the documentation only has a record of seven alarms being fitted and tested to the rig …." Id. at 142. In addition, Elkin determined that Orion had not addressed all of ADC's key conclusions and, as a result, EQT had no choice but to terminate the Rig 18 Drilling Contract. Elkin testified as follows:

> There were three very serious safety incidents. With two of those incidents, the blocks actually struck the floor. On the third incident, one of our contractors was within like a foot when the blocks hit the rig floor. To us, that was kind of an untenable situation. We just didn't feel comfortable that we could continue to operate this rig. It was based on those three incidents and, I think, it was truly based on the ADC report. They said in their own words, no matter how much testing we say they should do, we're still not sure that all the faults are going to be found. There's been so much wrong and so much history in regards to the system not working correctly, that they were unwilling to tell us that the rig could go back to work safely. In our mind, there was no way we could continue to operate the rig.

Id. at 143.  Further investigation was ruled out by EQT because:

> three near misses of that magnitude was really enough.  And it was our opinion that there was a history with Orion that they would do stuff, but typically, we would have to point it out to them that it needed done, hey, you need to do this, and then they would do it.  A lot of times it was a struggle to get them to do it.  They had, in regards to the first dropped block, they had given us a reason; it proved to be incorrect.  With the second dropped block, they had assured us that it wasn't going to happen again and six months later, basically, it happened again.  So we had just basically lost faith that they could operate the rig safely.

Id. at 144.

Elkin testified that on July 27, 2016, he sent Orion notice of termination of the Rig 18 Drilling Contract with a list of safety concerns that had arisen and EQT's conclusion that Orion could not ensure the rig's safe operation.  Id. at 144; ECF No. 369-27.  The termination letter stated that repairs and preventative measures had not been completed to EQT's satisfaction and as a result of Orion's continued default, EQT terminated the contract in accordance with Section 6.5 and Exhibit C, "effective immediately."  Id.  Elkin testified that Orion performed an FMEA on Rig 17, but did not complete all remedial measures identified by ADC.  Accordingly, "based on the history of both rigs' operation and the accumulation of the two ADC reports, the Orion responses, not just to this incident but the prior two incidents, we really could come to no other conclusion in our mind that we needed to terminate Rig 17 as well."  ECF No. 353 at 146.  On September 12, 2016, 59 days after its notice of default, EQT sent Orion notice of termination of the Rig 17 contract based upon Orion's "violation of Section 6.5."  Id.  Elkin testified that fundamentally, "it was our opinion that [Orion] could no longer operate the rig safely."  Id. at 148.

Orion filed the Complaint commencing the instant litigation on September 30, 2016.  At Count I, Orion alleges breach of the Rig 18 Drilling Contract and seeks damages in an amount not

less than $21,002,000; and at Count II, alleges breach of contract of the Rig 17 Drilling Contract and seeks damages in an amount not less than $11,100,000.  ECF No. 1.

Subsequent to filing suit, Orion contracted with WPX Energy, LLC to undertake drilling operations utilizing Rig 18.  Despite Orion's repeated representations to EQT and its insistence that all control system defects had been cured, Rig 18 experienced a fourth dropped block incident on June 17, 2017, nearly a year to the day of the third incident.  ECF No. 362 at 4-5.  The cause of the event was identified as an error listed in the preventative maintenance required by the 2016 FMEA conducted by Orion at EQT's request, as well as a failure of the control system to identify an electrical fault issue and automatically set the brake.  ECF No. 331 at 121-22.

Following the presentation of evidence in the trial of this matter, the jury deliberated and returned a verdict in favor of EQT as to Count I, finding that EQT had not breached the Rig 18 Drilling Contract.  ECF No. 329.  As to Count II, the jury returned a verdict finding that EQT breached the Rig 17 Drilling Contract, but further determined that Orion was in material breach of the contract.  The Court permitted the jury to consider whether the material breach was sufficient to relieve EQT of providing a cure period.  The jury found that Orion was entitled to a cure period, but determined that Orion had failed to cure its material breach of the Rig 17 Drilling Contract. Id. Judgment was entered on the verdict in favor of EQT as to both Count I and Count II of Orion's Complaint. Thereafter, Orion timely filed the pending post-trial motions and the motions are now ripe for consideration.

## II.  STANDARD OF REVIEW

### A.  Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(a),

[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

      (A) resolve the issue against the party; and

      (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  Under Rule 50(b),

[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50(b).

The Court may address only issues raised in a 50(b) Motion which were first raised in the 50(a) Motion.  See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1172 (3d Cir. 1993) ("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion.").  "Absent a motion in accordance with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence abridges [a party's] right to a trial by jury."  Id. at 1173 (quoting Fineman v. Armstrong World Indust., Inc., 980 F.2d 171, 183 (3d Cir. 1992)).

However, if the issues raised in a 50(b) Motion have been properly preserved, the Court may grant a motion for judgment as a matter of law if,

> viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.

Id. at 1166 (internal citations omitted). In doing so, "the court should review the record as a whole, [but] must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000); Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1348 (3d Cir. 1991). To grant judgment as a matter of law in favor of a party that bears the burden of proof on an issue, the Court "must be able to say not only that there is sufficient evidence to support the [movant's proposed] finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1177 (3d Cir. 1976); Amgen Inc. v. Hospira, Inc., 336 F. Supp. 3d 333, 340–41 (D. Del. 2018).

### B. Motion for a New Trial or to Alter or Amend a Judgment

In the alternative, Orion seeks a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, asserting eighteen errors related to the admission or exclusion of evidence, jury instructions, and the Court's resolution of certain issues of law. ECF Nos. 371, 372. Under Rule 59(a)(1)(A), the Court "may, on motion, grant a new trial on all or some of the issues—and to any party ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court." The ordering of a new trial pursuant to Rule 59 is within the sound discretion of the district court. Wagner by Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).

A motion for new trial based on an alleged error concerning the court's evidentiary rulings or jury instructions necessarily concerns a matter within the discretion of the trial court. In such instances, "a District Court must first determine whether an error was made during the course of the trial, and then determine 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'" Bogaski v. Cty. of Allegheny, Pennsylvania, No. CV 15-487, 2018 WL 1471977, at *1–2 (W.D. Pa. Mar. 26, 2018) (quoting Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990)). "Whether any error committed by the court was harmless is governed by Federal Rule of Civil Procedure 61. Thus, '[u]nless a substantial right of the party is affected,' a non-constitutional error in a civil case is harmless. Linkstrom v. Golden T. Farms, 883 F.2d 269, [] (3d Cir. 1989). 'Absent a showing of substantial injustice or prejudicial error, a new trial is not warranted and it is the court's duty to respect a plausible jury verdict.' Montgomery Cty. v. MicroVote Corp., 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001)." Bogaski, 2018 WL 1471977, at *1–2.

Where a new trial is sought on the grounds that the jury's verdict was against the weight of the evidence, the court may grant the motion "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol. Rail Corp., 926 F.2d at 1353; and see Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 386 (3d Cir. 2016). "[T]his stringent standard is necessary 'to ensure that a district court does not substitute its judgment of the facts and credibility of the witnesses for that of the jury.'" Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir. 1996) (citations omitted). Accordingly, the party seeking a new trial must meet a high threshold in order to obtain this "extraordinary relief." Ponzini v. PrimeCare Med., Inc., 269 F.

Supp. 3d 444, 575 (M.D. Pa. 2017) (quoting <u>Marra v. Philadelphia Housing Auth.</u>, 497 F.3d 286, 309 n.18 (3d Cir. 2007)).

## III. DISCUSSION

### A. Orion's Motion for Judgment as a Matter of Law

Orion seeks entry of judgment as a matter of law ("JMOL") on three grounds. First, Orion argues that pursuant to the unambiguous terms of the Rig 17 and Rig 18 Drilling Contracts, EQT breached its duty to remit payment of liquidated damages owing as a result of EQT's early termination of both Drilling Contracts. Second, Orion contends there is insufficient evidence that EQT complied with the notice and cure provisions of each contract and, therefore, EQT failed to properly terminate either contract. Third, Orion asserts there is insufficient evidence to support a finding that Orion was in material breach of either Drilling Contract. ECF No. 373.

Orion's motion for JMOL is resolved by reference to settled contract interpretation principles and the evidence presented at trial establishing that the parties preserved three alternative termination remedies in the event of default, any one of which would permit EQT to terminate without breaching an obligation to pay liquidated damages.

The Pennsylvania Supreme Court has held that "the fundamental rule in contract interpretation is to ascertain the intent of the contracting parties." <u>Lesko v. Frankford Hospital-Bucks Cty.</u>, 15 A.3d 337, 342 (Pa. 2011).[3] Intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." <u>Murphy v. Duquesne Univ. of The Holy Ghost</u>, 777 A.2d 418, 429 (Pa. 2001). In this regard, Pennsylvania courts generally enforce the unambiguous terms of agreements between

---

[3] Pennsylvania law governs the interpretation of the Drilling Contracts. <u>See</u> ECF No. 1-3, § 18, Exhibit A § 7.14 and ECF No. 1-5, § 18, Exhibit A 7.14.

sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. See McMullen v. Kutz, 985 A.2d 769, 778 (Pa. 2009) ("freely negotiated agreements entered into at arms length are generally enforced according to their terms to allow parties the benefit of their bargains."); see also John B. Conomos, Inc. v. Sun Co., Inc. (R&M), 831 A.2d 696, 708 (Pa. Super. 2003) ("courts should not [generally] set aside terms on which sophisticated parties agreed.").

> If the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties. Kripp v. Kripp, 578 Pa. 82, 849 A.2d 1159, 1162 (Pa. 2004). If, however, the contractual terms are ambiguous, then resort to extrinsic evidence to ascertain their meaning is proper. Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 777 A.2d 418, 429 (Pa. 2001). A contract's terms are considered ambiguous "'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" Id. at 430.

Commonwealth by Shapiro v. UPMC, 208 A.3d 898, 910 (Pa. 2019) (quoting Kane v. UPMC, 129 A.3d 441, 463 (Pa. 2015)). "The 'reasonabl[e]' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 483 (Pa. 2009) (citing Murphy, 777 A.2d at 430).

Orion alleges entitlement to judgment as a matter of law based upon "conclusive" evidence of EQT's breach of the Rig 17 and Rig 18 Drilling Contract early termination provisions. ECF No. 374 at 2-5. In lockstep, Orion analyzes the elements of a breach of contract claim with reference solely to Exhibit A, Section 7.3, but fails to account for substantial trial evidence regarding the application of alternate relevant contract terms and the parties' course of conduct in light of those terms. Orion further improperly shifts the burden of proof to EQT to establish that it "properly terminated the Drilling Contracts under Exhibit A, § 7.3 and/or Section 6.5." ECF No. 374 at 5. Finally, Orion fails to account for the presentation of evidence supporting the jury's

conclusion that Orion was in material breach of the Rig 17 Drilling Contract at the time of termination.

As plaintiff, Orion bears the burden of proof as to its claims and, under the facts presented, must prove that EQT improperly terminated the Drilling Contracts. See, e.g., Giacone v. Virtual Officeware, LLC, No. 13-1558, 2014 WL 7070205, at *11 (W.D. Pa. Dec. 12, 2014), aff'd, 642 F. App'x 137 (3d Cir. 2016) ("[t]he burden of proof in a contract action is on the party asserting the breach who must prove the breach by a preponderance of the evidence."); Boyd v. Rockwood Area School Dist., 907 A.2d 1157, 1165 (Pa. Commw. Ct. 2006), appeal denied, 919 A.2d 959 (Pa. 2007)(Table) (in order to demonstrate a breach of contract, a plaintiff must establish: "(1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of duty imposed by the contract; and (3) damages resulting from that breach of duty").

In addition, Judge Ruggero Aldisert (joined by Judge Thomas Hardiman) acknowledged in Evergreen Community Power LLC v. Riggs Distler & Co., 513 F. App'x 236, 240 (3d Cir. 2013), that "[w]hen a party seeks to enforce a contract, or to recover damages for breach of a contract, 'that party must prove that he has performed all of his own obligations under the contract.' Trumbull Corp. v. Boss Const., Inc., 801 A.2d 1289, 1292 (Pa. Commw. Ct. 2002) (citation omitted)."

In the instant case, the evidence at trial was sufficient to permit the jury to conclude that Orion and EQT affirmatively incorporated two termination provisions in each Drilling Contract; the first provision, Section 6.5, is a defined "default" provision that retains all remedies at law and equity and further permits termination after a 7-day cure period and without further payment. The second provision, set forth at Exhibit A, Section 7.3, is an "early termination" provision that provides for a 50-day cure period for identified defects in performance and, if a cure period is not

provided, or termination occurs after cure, the payment of liquidated damages. Neither provision is ambiguous, and the evidence at trial permitted the jury to find that the parties, both sophisticated entities, operated with the understanding that the default provision set forth at Section 6.5 remained in effect. In particular, Squires testified that in September 2015, he received a notice of default from EQT citing Section 6.5 of the Rig 18 Drilling Contract. ECF No. 379 at 195-196. The notice stated that EQT considered the first Rig 18 dropped block incident sufficient to constitute default and requested cure within seven days. Orion undertook an immediate analysis, identified what it believed to be the cause of the incident, and represented that it "cured" the default, all within the allotted seven days. Id. When EQT invoked Section 6.5 after the second Rig 18 dropped block incident less than a month later, Squires did not contest the continued viability of Section 6.5, but objected to its application to an incident he considered equipment "malfunction." ECF No. 367-13. By its verdict, the jury assessed and rejected Squires' conflicting testimony that Section 6.5 had no meaning, and further rejected his claim that Section 6.5 had no application to the drilling operations it had undertaken on EQT's behalf. See ECF No. 379 at 179-80.

With regard to the propriety of termination under either Section 6.5 or Exhibit A, Section 7.3, the jury determined that EQT was not in breach of the Rig 18 Drilling Contract, but had breached the Rig 17 Drilling Contract (albeit, that EQT's continued performance was excused by Orion's own material breach and failure to cure). As to Rig 18, the jury was presented with evidence that the defects in the IDS control system were not timely cured and/or were incapable of cure. To that end, the jury learned of the extraordinary number of dropped block incidents, the high percentage of NPT, Orion's repeated inability to correctly identify and prevent control system flaws, and Orion's inadequate control system testing. Orion's own employees and contractors testified regarding the peril to EQT employees and contractors due to the dropped blocks and

unidentified control system failures and, further, that the number and nature of such failures were unheard of in the gas drilling industry.

Under these circumstances, the jury was presented with sufficient evidence to permit it to conclude that Orion was in default of the Rig 18 Drilling Contract under Section 6.5 for failing to supply materials sufficient to conduct operations within industry standards, and for otherwise engaging in ongoing and repeated workplace safety violations that were never cured. Therefore, JMOL on the basis of Section 7.3 of the Rig 18 Drilling Contract is not warranted.

Orion next challenges the verdict as to Rig 17, and contends that it is entitled to JMOL because EQT failed to meet its burden to prove by a preponderance of the evidence that Orion was in material breach of the Rig 17 Drilling Contract. In support of its argument, Orion states that because the Drilling Contracts contain an express provision for cure, material breach may only be found in instances of fraud or disloyal and dishonest conduct, and not where a party is merely disappointed with poor performance. ECF No. 374 at 11-12. EQT responds that pursuant to Pennsylvania law, material breach is not so limited, and the evidence elicited at trial sufficiently demonstrated that Orion's breach was material so as to permit the jury to find in EQT's favor. ECF No. 385 at 19.

Pennsylvania recognizes "a settled principle of contract law: a material breach by one party to a contract entitles the non-breaching party to suspend performance." Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. 2003) (citing Berkowitz v. Mayflower Securities, Inc., 317 A.2d 584, 586 (Pa. 1974)).

> "When performance of a duty under a contract is due, any nonperformance is a breach." Restatement (Second) of Contracts § 235(2) (1981). See Barnes v. McKellar, 434 Pa. Super. 597, 644 A.2d 770 (1994); Camenisch v. Allen, 158 Pa. Super. 174, 44 A.2d 309 (1945). If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract. Oak Ridge Const. Co. v. Tolley, 351 Pa. Super. 32, 504 A.2d 1343 (1985).

> If, however, the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective. Cimina v. Bronich, 517 Pa. 378, 537 A.2d 1355 (1988); Borough of Greentree to  Use of Castelli Const. Co. v. Tortorete, 205 Pa. Super. 532, 211 A.2d 76 (1965); Schlein v. Gross, 186 Pa. Super. 618, 142 A.2d 329 (1958). Accord John D. Calamari & Joseph M. Perillo, The Law of Contracts § 11-22 (2d ed.1977).  In other words, the non-breaching party does not have a right to suspend performance [if the breach is not material].
>
> ... "Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and it must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'" Gray v. Gray, 448 Pa. Super. 456, 468, 671 A.2d 1166, 1172 (1996) (citing 2401  Pennsylvania  Ave. Corp. v. Federation of Jewish Agencies, 319 Pa. Super. 228, 242-43, 466 A.2d 132, 139 (1983) (citations omitted)).

Duffala, 837 A.2d at 467-68.  The existence of material breach permitting immediate termination is not impacted by an agreed upon period for cure of defaults where the parties, as here, additionally include a contract term retaining "other remedies at law and equity."  In such instances, the specified notice and cure provisions are cumulative, and not the exclusive remedies. LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 652 (2009).

The following factors are to be considered in determining whether Orion's alleged breach of the Rig 17 Drilling Contract was so material as to excuse EQT's further performance and permit immediate termination:

    a) The extent to which the injured party will be deprived of the benefit which he reasonably expected;

    b) The extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

    c) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

    d) The likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

> e) The extent to which the behavior of the party failing to perform or offer
> to perform comports with standards of good faith and fair dealing.

Id. (citing Restatement (Second) of Contracts § 241 (1981)); ECF No. 335 at 28-30. These factors are "to be applied in light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." Restatement (Second) of Contracts § 241 cmt a. No single factor is dispositive. Norfolk So. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008).

The inquiry to determine whether material breach has occurred is particularly fact-intensive and therefore ordinarily delegated to the jury. Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1272 (Pa. Super. 2012). In this instance, the evidence was sufficient to permit the jury to resolve the issue of material breach and to specifically conclude, as it did, that Orion was in material breach of the Rig 17 Drilling Contract.

As a general matter, material breach has been found when a contractor consistently fails to meet an agreed-upon level of care, and repeatedly fails to cure identified deficiencies. See, e.g., U.S. ex rel. Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of America, No. 06-0234, 2009 WL 4730233 *52 (W.D. Pa. Dec. 4, 2009). In Greenmoor, the District Court noted that "[w]hen deficiencies become the rule … overall performance under the contract can be deemed unsatisfactory even though individual problems are resolved. In such a case, the repeated need for correction itself may serve as the default, making termination an appropriate remedy." Id. (citing Cervetto Bldg. Maint. Co. v. U.S., 2 Cl. Ct. 299, 301-02 (Cl. Ct. 1983)). Repeated failure to perform deprives a party of the benefit for which it expected under the contract and material breach is appropriately found. Tyro Indus., Inc. v. Trevose Const. Co., Inc., 737 F. Supp. 856, 866 (E.D. Pa. 1990) (ongoing failure to maintain liability insurance coverage as required by contract

demonstrated lack of good faith and was sufficiently critical to performance of obligations entered into to constitute material breach).

In the instant case, the jury learned that both Rig 17 and Rig 18 shared identical IDS control system software and hardware. ECF No. 379 at 173. The jury heard that Rig 17 experienced a dropped block event shortly after delivery by Orion, causing the rig elevators to strike the derrick and destroy adjacent piping. ECF No. 331 at 67-8; ECF No. 333 at 120-21, 128-129; ECF No. 379 at 86. Rig 17 experienced a second uncontrolled movement in November 2015, and NPT far in excess of EQT's other rigs and industry standards. ECF No. 333 at 140-43, 173-75, 184-88, 195-201; ECF No. 334 at 51-56. The jury learned that Rig 18 experienced at least three dropped block incidents prior to termination and that after each incident, Orion represented that it had corrected all deficiencies to the control system. In light of these facts, Orion's repeated insistence that it had cured all control system faults and that the rigs were safe to operate was appropriately weighed by the jury in determining whether EQT was deprived of the benefits for which it had contracted.

In terms of adequate compensation for EQT's loss of agreed-upon drilling operations, the jury was free to consider but refuse to allocate or quantify the potential cost to EQT of another dropped block incident, and the possibility that it could result in death or serious bodily injury. Evidence of Orion's repeated insistence that it had cured all defects, followed by additional dropped block incidents, was sufficient to further permit the jury to resolve whether Orion was capable of curing evident control system defects and, indeed, whether it could be trusted to carry out its obligations under the Drilling Contract in good faith. Under these circumstances, JMOL in favor of Orion on the issue of material breach is not warranted and Orion's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), ECF No. 373, is denied.

### B.  Motion for New Trial Pursuant to Rule 59

Orion presents a Motion for New Trial Pursuant to Rule 59, setting forth eighteen grounds of alleged error related to evidentiary and legal rulings of this Court.  ECF Nos. 371, 372.  Each basis for objection to a ruling is addressed as follows.

### 1.  Right to Terminate Contract Pursuant to Section 6.5

Orion argues that a new trial is necessary because the Court fundamentally erred in concluding that Section 6.5 of the Rig 17 and Rig 18 Drilling Contracts applied to the parties' drilling operations, and further compounded the error by failing to instruct the jury that termination in accordance with Section 7.3 was the exclusive remedy for default.  ECF No. 372 at 7-11.  Because EQT terminated the Rig 18 Drilling Contract pursuant to Section 6.5, and failed to give the full 50 days required by Section 7.3, Orion alleges EQT breached the contract by failing to pay Orion liquidated damages.  Orion advances this argument with regard to Rig 17 as well, despite evidence that EQT provided a cure period of 59 days in accordance with Section 7.3, and despite the jury's conclusion that termination was otherwise appropriate due to Orion's material breach of the Rig 17 Drilling Contract.  The arguments are variations of the grounds that Orion asserted in its Motion for Judgment as a Matter of Law, ECF No. 373, and are rejected for similar reasons.

 First, while it is clear that the parties struck the Early Termination provision in Section 6.4 in favor of the language contained in Exhibit A, Section 7.3, it is equally clear that the parties *retained* Section 6.5 as a "for cause" or "default" termination provision.  The Drilling Contracts thereby afford EQT discretion to demand immediate cure in instances of qualifying default or, pursuant to Section 7.3, to afford a longer cure period of 50 days in less egregious instances. The Court will not ignore terms that plainly have been retained by sophisticated business entities in the

absence of any evidence of error.  See McMullen v. Kutz, 985 A.2d at 778; Conomos v. Sun, 831 A.2d at 808 ("courts should not [generally] set aside terms on which sophisticated parties agreed").

Orion next argues that by its language, Section 6.5 has no application to a contract for a term of days, as opposed to a single project.  Alternatively, Orion contends that Section 6.5 permits EQT to recover damages in instances of default, but does not relieve it of a burden to pay liquidated damages to Orion where default results in early termination.  ECF No. 372 at 9.  EQT responds that Orion's interpretation would give no meaning to Section 6.5 and would permit termination for default only upon the payment to the defaulting party, a result it correctly argues is absurd.  ECF No. 386 at 12.

The Court finds that Orion's proffered interpretation is unreasonable.  As EQT notes, Section 6.5 expressly provides that, in the event of a qualifying default, EQT has the right "[t]o terminate … this Contract for the work … and complete the work by whatever method [EQT] deems expedient."  Section 6.5 further permits EQT to pursue "any other remedy provided under this Contract or available at law or equity."  ECF No. 1-3 at 4.  Orion's interpretation fails to account for the inclusion of this language and ignores the cumulative savings clause reserving all other equitable rights and remedies.  Because a plain reading of the entire agreement indicates that Exhibit A, Section 7.3 is not the exclusive means by which the agreement could be terminated, Orion's proposed jury instruction limiting termination to Section 7.3 was appropriately denied, and the grant of a new trial on this basis is unwarranted.

### 2. Material Breach Instruction

Orion next claims that a new trial is warranted due to alleged error by the Court in charging the jury that EQT could terminate for "material breach."  ECF No. 372 at 11.  Orion restates its arguments in favor of JMOL, and contends that Orion's conduct amounted, at most, to poor

performance and "safety issues" which do not rise to material breach under Pennsylvania law.  Id. at 13, citing Milton Reg'l Sewer Auth. v. Travelers Cas. & Sur. Co. of America, 648 F. App'x. 215, 217 (3d Cir. 2016).  Orion further argues that the reservation of equitable remedies set forth in Section 6.5(2)(c) does not overcome express conditions for termination requiring notice and cure.  Finally, Orion contends that EQT failed to assert material breach in its notice of default and termination and otherwise failed to assert material breach as an affirmative defense in its Answer and, therefore, is not entitled to terminate without payment of liquidated damages pursuant to this equitable remedy.  ECF No. 372 at 11-16.

EQT responds that its Answer to the Complaint sufficiently pleads all facts necessary to find that Orion was in material breach of the Rig 17 and Rig 18 Drilling Contracts, and that there is no binding authority that material breach must be pled as a separately captioned affirmative defense.  ECF No. 386 at 19.  EQT further contends that Orion otherwise misconstrues Pennsylvania law and, in any event, Orion has not identified any prejudice resulting from the Court's jury instruction.  Id. at 14-19.

EQT's Answer to the Complaint alleges that Rig 18 experienced at least three dropped block events, and that Rig 17 experienced at least one dropped block event, all of which placed workers' safety at risk.  ECF No. 76 ¶¶ 7, 8.  EQT further pleads that both rigs experienced numerous malfunctions endangering workers and rendering neither rig "safe to operate given the flaws within the control system." Id. ¶¶ 9, 10. In addition, EQT alleges that Orion improperly maintained the rigs, and failed to properly operate either Rig 17 or Rig 18.  On each of these grounds, EQT pleads it was justified in terminating its contractual relationship with Orion.  Id. ¶¶ 11, 12, 18.  The Court finds that with these allegations, EQT has sufficiently pled the elements

for the defense of material breach.  <u>See</u> Fed. R. Civ. P. 8(b) ("In responding to a pleading, a party must: (A) state in short and plain terms its defenses to each claim asserted against it").

EQT also raised material breach as a counterclaim for declaratory judgment, thereby placing Orion on specific notice of EQT's reliance on material breach as both a defense and as an independent basis for relief. <u>Id.</u>  ECF No. 76 at 9-13.  On the eve of trial, citing the overlap of issues and facts and available relief, EQT filed a Motion for Voluntary Dismissal of Counterclaim without prejudice, which was granted by the Court.  ECF No. 279; ECF No. 302.  EQT continued to defend its termination of the Drilling Contracts on the basis of material breach and raised the defense at the close of Orion's presentation of its evidence in its Rule 50(a) motion for judgment as a matter of law.  ECF No. 333 at 34-38.  In response, Orion asserted that "any argument that EQT is entitled to terminate … for material breach is an affirmative defense which cannot form the basis for a Rule 50 motion *before EQT has put on its case*."  ECF No. 333 at 41 (emphasis added).  With its only procedural objection made as to timing and *not* as to the sufficiency of EQT's Answer to the Complaint, Orion understood that EQT was proceeding with material breach as a defense to Orion's claims, and thereby has waived its present and untimely objection.   Had Orion's current objection been timely raised, EQT would have had the opportunity to renew its counterclaim or amend its Answer to add a specifically titled but redundant defense for material breach, and any such motion would have been granted given the absence of surprise or prejudice. <u>See</u> <u>Balter v. United States</u>, 172 F. App'x 401, 403 (3d Cir. 2006) ("affirmative defenses (including the statute of limitations) are not waived if raised at a 'pragmatically sufficient time' with no prejudice to the plaintiff") (citing <u>Eddy v. Virgin Islands Water & Power Auth.</u>, 256 F.3d 204, 209 (3d Cir.  2001), and <u>Charpentier v. Godsil</u>, 937 F.2d 859, 864 (3d Cir. 1991)).

With regard to the merits of Orion's objection, the jury considered material breach only as to Rig 17 in light of the jury's conclusion that EQT did not breach of the Rig 18 Drilling Contract. ECF No. 329. The evidence at trial established that the IDS control system defects repeatedly placed contractors' and employees' lives at risk, and remained uncured. As just one example, the jury learned that on June 7, 2016, Joshua Cunningham was employed by an Orion contractor to work as a "tong operator" on Rig 18. ECF No. 334 at 15-17. In this capacity, he worked with a crew of five men on the rig floor adding 60 to 70 pound, 40-foot lengths of casing pipe to be used for gas extraction. Id. at 18-22. While looking down toward the joint of the casing, and pulling a slip of pipe, he felt something graze his head, and stepped back. Id. at 22-25. At that moment, the block "just dropped" and the elevators hit the floor. He did not have time to react, and had he not stepped back he would have been hit by the elevators and badly hurt or killed. Id. The other men working on the rig floor also escaped injury when the elevator struck the floor, kicking out the remaining 60-70-pound slips across the rig floor. Id. at 26.

While Orion casts this episode as an "allegation of poor performance," ECF No. 372 at 13, the jury could determine, as it did, that Orion's conduct in repeatedly representing it had cured a defective control system shared by both Rig 17 and Rig 18, and placing workers' lives at risk under the weight of a 50,000 pound drawworks, was "so fundamentally destructive, it understandably and inevitably cause[d] the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate." LJL Transp., 962 A.2d at 652. Under these circumstances, a charge permitting a finding of material breach was properly afforded.

Nonetheless, any potential prejudice to Orion from the material breach charge was removed by the Court's charge and verdict form which permitted the jury to determine whether, despite material breach, Orion should have been afforded time to cure, and whether despite additional

time, Orion cured the material defects apparent in its performance. With these additional specific findings, the Court's instruction departed from the remedy of immediate termination afforded in instances of material breach and permitted the jury to consider the nature and consequences of the breach so that it could determine, in light of "the actual custom of men in the performance of contracts similar to the one that is involved," whether immediate termination should be afforded, or whether some cure period should remain. 2401 Pennsylvania Ave. Corp. v. Fed'n of Jewish Agencies, 466 A.2d at 139 (acknowledging inquiry into industry custom to determine material breach). The jury determined that Orion was in material breach of the Rig 17 Drilling Contract, but also determined that an opportunity to cure was required. The jury went on to find that despite the provision of time to cure, Orion failed to correct or remedy the material breach. Thus, the jury did not award the remedy of immediate termination ordinarily available under Pennsylvania law for material breach. Instead, the jury concluded that the IDS control system was not rendered safe in the 59 days between EQT's Rig 17 notice of default and termination, and that Orion therefore was not entitled to recovery. Under these circumstances, the material breach charge did not prejudice Orion and the grant of a new trial is not warranted on this basis.

### 3. Orion's Obligation to Perform

Orion next argues that that the Court erred in charging the jury with the basic proposition that to bring a breach of contract claim, Orion was required to establish it had performed its own obligations under the Drilling Contracts. ECF No. 372 at 16-17; ECF No. 335 at 27. Orion contends that the requirement is not consistent with Pennsylvania law and, given the nature of the contracts (characterized by Orion as "take or pay"), EQT was obligated to pay Orion even if it did not use the rigs. ECF No. 362 at 17. EQT responds that each of these arguments lacks legal or factual support. ECF No. 386 at 19-21.

It has long been recognized that where a contract requires performance of obligations by both parties, a plaintiff who has "defaulted in the performance of his part of the contract[] could not thereafter compel the defendants [] to perform on their part." Wasserman v. Steinman, 304 Pa. 150, 155 A. 302, 303 (1931). As previously noted, Judge Aldisert, joined by Judge Hardiman, readily applied this concept in a construction dispute for pipe installation in Evergreen Community Power, 513 F. App'x at 240, and affirmed the entry of judgment against a defendant on its breach of contract counterclaim where the defendant failed to prove that it had fulfilled all of its obligations under the contract. Similarly, in Greenmoor, a plaintiff asbestos removal contractor repeatedly failed to perform in compliance with the agreed-upon level of care and skill, and thereby exposed workers and tenants to the risk of asbestos contamination. The District Court explained that under Pennsylvania law, the party alleging breach must establish the rote elements of a contract claim, but also "must 'prove that he has performed all of his own obligations under the contract.'" Greenmoor, 2009 WL 4730233, at *49 (quoting Trumbull Corp. v. Boss Constr., Inc., 801 A.2d at 1292).

Orion objects to the charge based upon its characterization of the Drilling Contracts as "take or pay." This construction ignores express performance requirements regarding environment, health, and safety. By these terms, Orion agreed to ensure that conditions at its work sites are safe and nonhazardous, and to rectify any hazards arising from its own operations. See, e.g., ECF No. 1-5, § 27.2(I). In light of Orion's affirmative obligations in this regard, requiring a showing of satisfactory performance as a predicate to recover damages for breach of contract arising from Orion's creation of a hazardous condition is well supported by Pennsylvania law.

Orion cannot establish that the charge, even if erroneous, resulted in substantial prejudice warranting a new trial. The evidence overwhelmingly supports the jury's conclusion that EQT did

not breach the Rig 18 Drilling Contract and that Orion was in material breach of the Rig 17 Drilling Contract, due to Orion's repeated failure to cure the defective IDS control system and its false representations that the control system was safe for continued drilling operations. Under these circumstances, Orion's motion for a new trial on the basis of this aspect of the Court's charge is denied.

### 4. "As Is" Provision and Evidence of Rig Defects

Orion next contends that it is entitled to a new trial because the Court permitted evidence of each rig's dangerous condition despite a term in the Drilling Contracts whereby EQT "acknowledges that it has inspected the rig and accepts the rig 'as is.'" ECF No. 372 at 18-21. Orion asserts that the Court compounded the error by failing to permit Orion to elicit testimony regarding the meaning of "as is." Orion likewise contends that it was entitled to a requested jury instruction that EQT accepted the rigs "as is" and therefore assumed the entire risk as to the quality of the rigs. ECF No. 204 at 20.

EQT responds that Orion's argument and characterization of the "as is" contract term ignores additional Drilling Contract provisions requiring Orion to "*supply sufficient ... materials*" to complete its "*obligations ... with due diligence in a good and workmanlike manner in accordance with industry standards, practices and procedures*...." ECF No. 386 at 21-22 (citing § 6.5(1)(D), Exhibit A § 7.3(c) (italics supplied)). EQT also points to trial testimony regarding Orion's repeated investigations and attempts to repair and cure control system defects as evidence of Orion's acceptance of responsibility for all performance obligations, including repair of rig defects, despite the presence of the "as is" term. Id. at 23-25.

The Court considered Orion's arguments with regard to its motion in limine to limit evidence of defect, ECF No. 168, and determined that pursuant to Pennsylvania law, an "as is"

term restricts application of implied warranties, but does not preclude claims or evidence of defects where the parties have agreed to or are subject to conflicting contract or statutory obligations. ECF No. 348 at 55-58. See, e.g., Morningstar v. Hallett, 858 A.2d 125, 131 (Pa. Super. 2004) (where contract contained terms creating express warranty as to age of horse to be delivered, "as is" clause elsewhere in contract could not disclaim that express warranty); and see Phelps v. Caperoon, 190 A.3d 1230, 1238 (Pa. Super. 2018) ("as is" clause does not bar application of conflicting statutory obligations on seller).

In this regard, the Drilling Contracts specifically required Orion to operate the rigs in a safe manner and in accordance with industry standards and practices. Issues related to the design of software and integration of IDS control systems are inextricably interwoven with required performance standards, as evidenced (repeatedly) by Orion's additional agreements and efforts to repair the evident control system defects. Under these circumstances, the "as is" clause was not understood by Orion or EQT to annul independent contract provisions to conduct operations safely and in a workmanlike manner in accordance with industry standards, and to adhere to applicable safety procedures and policies. Capek v. Devito, 767 A.2d 1047, 1050 (Pa. 2001) (one part of a contract cannot be interpreted to annul another part, and a contract must be construed, if possible, to give effect to all of its terms).

Because Orion's motion in limine and proposed jury instruction fail to account for its own simultaneous and separately bargained for agreement to undertake drilling operations in a safe manner and to permit termination in the event safety issues were not cured, a new trial on the basis of the "as is" clause is not warranted. [4]

---

[4] Orion contends that by excluding evidence of the "as is" clause, the Court imposed an extra-contractual obligation to provide "the safest rig design possible [or to] undertake to conduct specific testing and validation." ECF No. 372 at 20. On the contrary, the Court declined Orion's request to invoke the "as is" provision to permit Orion to escape its negotiated obligations to cure hazardous working conditions placing rig workers at peril.

### 5. March 2016 Settlement Agreement

Orion next asserts error related to the Court's denial of Orion's motion in limine to preclude EQT from introducing evidence regarding the September 2015 and October 2015 Rig 18 dropped block incidents, as well as evidence of performance issues that occurred prior to March 2, 2016. ECF No. 372 at 21-22. Orion argues that the evidence was within the scope of a Settlement and Release Agreement entered into by the parties after the second dropped block incident, and therefore was improperly considered by the jury.

Immediately after the second dropped block incident, the parties entered into a Third Amendment to the daywork drilling contract for Rig 18, whereby Orion agreed to perform testing of the rig to identify the cause of the incidents at its sole expense. ECF No. 166-3. On December 16, 2015, EQT demanded that Orion pay for "EQT's incurred costs due to Orion's defective operation of and defective performance of … Rig 18." ECF No. 167 at 2. EQT requested that Orion "submit full (100%) reimbursement to EQT" of costs related to dropped block incidents and rental costs of a replacement rig stack, a sum equal to $559,669.29. ECF No. 166-4.

On March 2, 2016, the parties entered into the Settlement and Release Agreement. The Recitals set forth the issues and claims the parties wished to resolve as follows:

> 1.2 WHEREAS, EQT submitted a letter dated December 16, 2015 of material failure pertaining to the Drilling Contract wherein EQT alleges entitlement to reimbursement of $559,669.29 from Orion and also alleges that, prior to the date of this Agreement, Orion defectively operated Orion's drilling rig, Orion's drilling rig performed defectively, Orion provided insufficient or substandard equipment, Orion failed to comply with requirements and provisions of the Drilling Contract, Orion caused nonproductive time and delayed the completion of drilling operations … and Orion caused EQT to sustain additional costs (hereinafter the "Allegations").

> 1.3 WHEREAS Orion and EQT wish to resolve all issues and claims arising from or related to the Allegations …

Agreement

2.1.a. EQT will receive, through credit on Orion invoices, total consideration of $279,834.65 …

2.1.b EQT … [releases and discharges] Orion … of and from any and all claims, liabilities, damages, costs, offset entitlements, demands, expenses and/or causes of action arising from or pertaining to the Allegations

c. EQT agrees to indemnify, defend and hold harmless Orion … against any and all claims brought by, through, under right of, or on behalf of EQT that arise from or are related to the allegations, but this section only applies to the allegations that occurred prior to the date of this agreement

ECF No. 167 at 2-3. Orion contends this language unambiguously precludes the admission of any evidence of the first two dropped block incidents or any evidence of defective equipment or performance prior to March 2, 2016. EQT responds that the agreement released Orion from financial claims and liabilities owed by Orion to EQT, and does not address EQT's ability to consider past events when making future contract termination decisions or in resolving claims allegedly owed by EQT to Orion. ECF No. 386 at 26.

The Court denied Orion's motion in limine upon determining that, by its unambiguous language, the Settlement Agreement and Release applies only to "claims, liabilities, damages, offset entitlements, demands, expenses, and/or causes of action arising from or pertaining to the Allegations" that could be asserted by EQT against Orion. ECF No. 51-55.[5] The dropped block

_____

[5] See Tedesco Mfg. Co. v. Honeywell Intern. Inc., 371 F. App'x 316, 319 (3d Cir. 2010):

"Settlement agreements 'are regarded as contracts and must be considered pursuant to general rules of contract interpretation.'" Miller v. Ginsberg, 874 A.2d 93, 99 (Pa. Super. 2005) (quoting Friia v. Friia, 780 A.2d 664, 668 (Pa. Super. 2001)). In interpreting a written contract,

[f]irst, the court must make a preliminary inquiry as to whether the contract before it is ambiguous. This question is an issue of law for the court to resolve. A term is ambiguous if it is susceptible to reasonable alternative interpretations. If the court determines that a given term in a contract is ambiguous, then the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations.

incidents are not raised by way of itemized claims or demands asserted by EQT against Orion. EQT is not claiming, demanding, or seeking payment or an offset because of these incidents or performance issues.  Rather, EQT is raising the facts related to the incidents as a *defense* to *Orion's claims*.  The language employed in the March 2, 2016 Settlement and Release Agreement is not ambiguous, and EQT's use of the dropped block incidents as a *defense* to claims asserted against it is not precluded by the plain language of the agreement.  A new trial on this basis is not warranted.

### 6.  Satisfaction Instruction

Orion next contends that it sustained prejudicial error as a result of the Court's instruction to the jury as follows:

> I am now going to address with you satisfactory performance.  An agreement that certain products or services must be furnished to the satisfaction of the buyer is enforceable.  In this case through the fourth amendment to the rig 18 drilling contract, the parties agreed to this term as to the repairs to rig 18.
>
> In this circumstance, the test of adequate performance is whether EQT, the party for whom the product or services were furnished by Orion, was satisfied with Orion's performance.  This is a subjective standard which means that the test is not whether EQT ought to be satisfied but whether EQT was actually satisfied.
>
> However, any dissatisfaction on its part must be genuine and not prompted by caprice or bad faith. In this case, EQT contends that it properly terminated the rig 18 drilling contract, because it was not satisfied with the repairs and preventative measures undertaken by Orion.  If you decide that Orion did not perform the identified repairs and preventative measures on rig 18 to the genuine satisfaction of EQT, you should find that EQT properly terminated the rig 18 drilling contract and is not liable to Orion.

---

Sanford Inv. Co. v. Ahlstrom Machinery Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999) (citations omitted).

ECF No. 335 at 31-32. This jury instruction was requested by EQT based upon the language of the Fourth Amendment of the Rig 18 Drilling Contract, which provides, in relevant part:

> 2. Orion will complete the formal investigation and root cause analysis of the uncontrolled block movement pursuant to EQT's shut down notice within the extended cure period specified in paragraph 1. Specifically, in addition to Orion delivering a final report for its investigation and undertaking all necessary Rig repairs, Orion will cooperate with EQT and Aberdeen Drilling Consultants, Ltd. (ADC), the independent safety engineering firm selected by EQT, in ADC's inspection and assessment of whether Orion has satisfactorily completed all repairs and undertaken all preventative measures necessary to ensure the safe operation of the Rig…. If ADC finds that additional repairs or preventative measures are necessary to ensure the safe operation of the Rig, Orion will complete any and all identified repairs or preventative measures to the satisfaction of EQT and ADC prior to the extended cure period specified in paragraph 1.

ECF No. 1-6 at 2; ECF No. 204 at 21.

During the charge conference with the Court, Orion did not voice an objection to this instruction, but stated, "[i]f the court determines to give that instruction on satisfaction, Orion would request that the court use Orion's proposed alternative instruction 41." ECF No. 334 at 150, and see, ECF No. 204 at 21. The proposed alternative required the jury to consider whether EQT's dissatisfaction was genuine, and not withheld by caprice or bad faith. Upon consideration of Orion's proposed instruction, the Court adopted "a hybrid combination of what both [parties] have proposed." Id. at 167. The Court inquired as to whether any party objected as to the proposed instructions as to satisfaction, and counsel for Orion indicated, "[s]ubject to our original objection as to any instruction being given, the proposed – the proposed instruction Your Honor just read into the record is acceptable to Orion." Id. at 170. The Court has examined the record and cannot locate Orion's "original objection" beyond a request to modify EQT's proposed language "if given." Under these circumstances, Orion has not properly preserved its objection because it failed to timely state any grounds for consideration by the Court, and thereby eliminated an opportunity

for correction of error, if any. See Fed. R. Civ. P. 51(c)(1) ("A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection.").

Even if Orion had preserved its objection, the instruction remains proper. First, the Court incorporated the standard agreed upon by the parties in the Fourth Amendment which required ADC to assess and determine whether repairs and preventative measures were satisfactorily completed. Second, the Court included Orion's requested language requiring rejection of cure to be based upon genuine dissatisfaction, unprompted by caprice or bad faith. See Jenkins Towel Serv., Inc. v. Tidewater Oil Co., 223 A.2d 84, 86 (Pa. 1966) ("We have consistently held that where a contract provides for performance by one party to the satisfaction of the other, 'the test of adequate performance is not whether the person for whom the service was rendered Ought to be satisfied, but whether he Is satisfied, there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith.'")(emphasis through capitalization in original).

Finally, there was sufficient evidence regarding EQT's dissatisfaction with Orion's attempts to cure ADC-identified defects to present a jury question as to whether EQT's refusal to accept the rig was genuine and not predicated upon caprice or bad faith. Elkin testified that EQT requested an FMEA as part of Orion's cure. Orion performed the FMEA, but conducted it on a simulator and not on the rig itself. ADC raised objections concerning the inadequacy of remote simulator testing due to the lengthy history and nature of control system defects on Rig 18. Based upon ADC's representations in this regard, EQT determined that simulated testing and review constituted a failure to perform the preventative measures necessary to render the rig safe. ECF No. 355 at 126; ECF No. 353 at 141-145. In light of the evidence, the jury was properly instructed

to determine whether EQT's rejection of Orion's proffered cure was genuine or prompted by malice or bad faith, and a new trial on the basis of the instruction is unwarranted.

### 7. EQT's Purported Financial Motivation to Terminate Drilling Contracts

Orion seeks a new trial contending it sustained prejudice by the Court's exclusion of evidence inferring that EQT was financially motivated to terminate the Drilling Contracts. ECF No. 373 at 24. EQT filed two motions in limine seeking to preclude Orion's proposed evidence, raising relevance and unfair prejudice. ECF No. 223; ECF No. 155; ECF No. 159. Orion contends that in granting each motion, the Court removed from jury consideration questions regarding EQT's exercise of good faith in the termination process and whether EQT's reasons for termination were pretextual. Id.

Under Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable that it would be without the evidence; and ... the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible, and relevant evidence is admissible unless otherwise provided by the Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. However, Rule 403 precludes only evidence that is unfairly prejudicial, as "[v]irtually all evidence is prejudicial or it isn't material." Carter v. Hewitt, 617 F.2d 961, 972 n.14 (3d Cir. 1980) (quoting Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 618 (5th Cir. 1977)).

In this matter, the questions to be resolved by the jury were whether EQT breached the Drilling Contracts by failing to pay liquidated damages, or whether performance of this obligation was excused by Orion's alleged material breach. EQT contended that it properly terminated the

Rig 18 Drilling Contract because it provided adequate notice of default and its intent to terminate pursuant to Section 6.5 for defects that remained uncured.  As to Rig 17, EQT contended that any failure to pay liquidated damages was excused by Orion's material breach in conducting drilling operations in violation of industry standards utilizing hazardous equipment.

In light of the trial issues, EQT's motions in limine sought to exclude the following:

1. Orion's evidence that 8-9 months prior to termination of the Rig 17 and Rig 18 Drilling Contracts, EQT's David Elkin asked for internal reports regarding rig termination penalties for each operating gas/oil rig "in case the board asks me." ECF No. 235 Ex. 1. The requested reports listed four separate drilling companies operating six sites.

2. Orion's evidence of a form letter apparently drafted in January 2015 and possibly sent to all contractors asking each to revisit contract prices given a downturn in market. Id. Ex. 2.

3. Orion's evidence, proffered through its economic expert, that given the downturn in gas prices, EQT would obtain a financial benefit from terminating the Drilling Contracts and rebidding them with new contractors.

Orion argues that evidence of economic incentives to breach is relevant to EQT's alleged motivation to terminate the Drilling Contracts and its lack of good faith in refusing to accept Orion's representation that all control system defects had been cured.  ECF No. 373 at 27-28.

Pennsylvania law is clear that in a breach of contract action, "the subjective intent, or motive, of the contracting party is irrelevant."  Krafft v. Shenango Inc., No. 13-320, 2014 WL 917330, at *2 (W.D. Pa. Mar. 10, 2014) (citing Dunkin Donuts Inc. v. Liu, 79 F. App'x. 543, 547 (3d Cir. 2003) (motivational analysis is irrelevant)); accord MP III Holdings, Inc. v. The Hartford,

No. 05-1569, 2006 WL 2645156 at * 11 (E.D. Pa. 2006); Biborosch v. Transamerica Ins. Co., 603 A.2d 1050, 1058 (Pa. Super. 1992). This limitation has particular application where the contracts provide for termination based upon material breach or on specified grounds that have been asserted by the terminating party. See Dunkin' Donuts v. Liu, 79 F. App'x at 547 ("even if the Lius had produced sufficient evidence of Dunkin's ulterior motive, motivational analysis would have been irrelevant because the Lius' non-payment constituted a material breach of the contract, which provided Dunkin' legitimate grounds for termination"); and see, Bangert v. Harris, 553 F. Supp. 235, 239 (M.D. Pa. 1982) (quoting Mellon Bank, N.A. v. Aetna Business Credit Inc., 500 F. Supp. 1312, 1321 (W.D. Pa. 1980), and citing Pittsburgh C. & St. L. Ray Co. v. Lyon, 123 Pa. 140, 150, 16 A. 607 (1889) ("the motive for breaching a contract is not important and [] the recovery would be restricted to the damages caused by the breach itself. '[T]he measure being the same whether the defendant fails to comply with his contract through inability, or willfully refuses to perform it.")).

Orion has not provided the Court with citation to any authority to the contrary nor otherwise established that evidence of alleged financial motive is relevant to any fact of consequence. Either Orion's contract performance was materially deficient and remained so after an opportunity to cure, or it was not. Market forces simply are not relevant to this direct inquiry. Accordingly, Orion's motion for a new trial on the basis of exclusion of evidence of possible financial motivation to breach the Drilling Contracts is denied.

### 8. Evidence of Cost to Build Drilling Rigs

Orion next objects to the Court's exclusion of evidence of the cost incurred by Orion to construct each rig. Orion states that it incurred combined expenses of approximately $37 million dollars to construct Rig 17 and Rig 18, and that evidence of these amounts would clarify the

purpose of the liquidated damages provision of the Drilling Contracts. In addition, the evidence would demonstrate Orion's financial hardship in the event of early termination, lending credence to its argument that the parties intended Exhibit A, Section 7.3 to be the sole termination remedy. ECF No. 372 at 29-32. Orion additionally contends the evidence is relevant to a jury's determination of material breach. Id.

EQT responds that, like evidence of financial motivation, evidence of the cost to build the two rigs was appropriately excluded upon EQT's timely relevance objection. ECF No. 386 at 34-35.

Under the Federal Rules of Evidence, evidence is deemed relevant and admissible if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Court concluded that evidence of the cost to build each rig does not establish any fact of consequence and, at this juncture, Orion fails to demonstrate the relevance of the proffered evidence to the issues to be resolved. Further, the parties affirmatively agreed that in the event of unexcused breach, the measure of damages is a liquidated sum, $20,000, for each remaining day of the contract term, irrespective of the cost of building each rig. ECF No. 349 at 4. ECF No. 1-3 at 13. Orion has not argued that the agreed-upon measure of damages is unreasonable and, accordingly, the Court has little difficulty finding the evidence of rig construction cost irrelevant. See, e.g., Merrill Iron & Steel, Inc. v. Blaine Constr. Corp., No. 14-221, 2016 WL 704706, at *5 (W.D. Pa. Feb. 23, 2016) ("Under Pennsylvania law, 'a party that retains legally enforceable liquidated damages will be barred from seeking actual damages.' Blue Mountain Mushroom Co., Inc. v. Monterey, 246 F. Supp. 2d 394, 400 (E.D. Pa. 2002) (citing Carlos R. Leffler, Inc. v. Hutter, 696 A.2d 157, 162 (Pa. Super. 1997) ('[P]arties who agree to include a liquidated damages clause in their contract, and do

so properly, cannot later claim entitlement to actual damages; rather, in keeping with the law of contracts, the parties must be bound by their bargain.'")).  Therefore, Orion's motion for a new trial on the basis of the exclusion of evidence of rig construction costs is denied.

### 9. Evidence of NPT and Rig Repairs

Orion next contends that the Court improperly denied its motion in limine to exclude evidence of issues or problems with Rigs 17 and 18 that purportedly were not cited in EQT's default letters and notices for termination.  ECF No. 372 at 32; ECF No 174.  Orion argues that in the absence of affirmatively identifying any particular defect or issue in a default letter, EQT failed to provide an opportunity for cure and so is estopped from raising the defect at trial. ECF No. 175 at 4.

In denying the motion in limine, the Court agreed with EQT that Orion was on notice of issues regarding safety concerns and drilling performance throughout the duration of each Drilling Contract. In particular, EQT provided notice in September 2015 challenging "failures involving the Rig's IDS drilling system that have resulted in repeated non-productive time and therefore delayed the completion of drilling operations." ECF 229-2.  EQT's Rig 18 termination letter cited 116 safety and performance issues over the life of the Rig 18 contract, and set forth a lengthy list of safety and performance concerns.  ECF Nos. 229-4.  Similarly, EQT's default notice as to Rig 17 cited the occurrence of 125 incidents, many of which placed drill personnel in danger or resulted in repeated incidents of drill failure.  ECF No. 229-5.  In each instance, EQT cited pertinent contract provisions requiring Orion to perform its operations in accordance with industry standards and in a workmanlike manner, contending that each rig was unsafe, and that continued operation was in violation of EQT safety policies and OSHA regulations.  ECF No. 367-37, 38.  At trial,

Squires confirmed his receipt of EQT's notices of defaults and the extensive list of defects identified with respect to each Rig. ECF No. 379 at 208-215.

Because Orion was placed on timely notice of the multitude of alleged defects in each rig, the admission of evidence of rig defects and performance issues does not warrant the grant of a new trial.

### 10. Discovery Rulings regarding other EQT Drilling Contracts/Rates

Orion next objects to the Court's denial of two Motions to Compel, ECF Nos. 47 and 59. Through its motions, Orion sought discovery related to all EQT drilling operations throughout the United States for the period 2012 through 2016, as well as an uncontrolled block movement in June 2017 on a rig operated by another contractor on EQT's behalf. Orion contends that in the absence of this information, it was precluded from establishing that its performance was within parameters otherwise accepted by EQT with its other contractors.

Orion's burden at this stage of the proceeding is high and cannot be met absent a showing that the Court abused its discretion in denying the motions to compel and, that as a result, it was "impossible to obtain crucial evidence." In re Fine Paper Antitrust Litig., 685 F.2d 810, 818 (3d Cir. 1982); and see Ekhato v. Rite Aid Corp., 529 F. App'x 152, 154 n.3 (3d Cir. 2013) (affirming district court's denial of employee's motion to compel employer's financial documents, personnel files, private communications between co-employees on relevance grounds, because employee failed to make "the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant") (internal citation omitted).

Upon review of Orion's Motion to Compel, ECF No. 47, and EQT's response, ECF No. 51, it is evident that EQT provided documents and information related to contracts that replaced Orion's Rig 17 and Rig 18 Drilling Contracts, as well as contracts related to all drilling operations

in Pennsylvania and West Virginia in the years 2008 through 2016. In addition, EQT provided information related to all drilling rig contracts terminated by EQT between 2012 and 2016, including the reason each contract was terminated. Id. at 2. EQT agreed to provide, but had no documents in response to Orion's request related to work stoppages on rigs operated by EQT attributable to control system defects. EQT further provided information related to notices it sent to drilling contract companies regarding the failure to follow safety-related rules and policies.

The Court denied the Motions to Compel, finding that Orion's request for drilling day rates for all EQT drilling rig contracts between 2012 and 2016 was overly broad and, based upon the information provided for Pennsylvania and West Virginia, was otherwise satisfactorily resolved. Id. In light of the documents actually produced, Orion was not impeded from presenting argument or evidence at trial regarding EQT's resolution of contractor production issues, and the ruling therefore did not result in substantial prejudice.

Orion's second Motion to Compel sought information regarding any rigs that experienced an uncontrolled block movement. ECF No. 59. EQT responded to the initial document request and provided information for the five-year period immediately preceding termination of the Rig 18 and Rig 17 Drilling Contracts, as well as documents indicating that a third-party rig experienced an uncontrolled block movement on or about June 6, 2017. ECF No. 59-4 at 2. Orion requested that EQT supplement its response and provide all documents related to the 2017 incident. ECF No. 59 at 2. EQT objected, contending that the information was irrelevant because the occurrence took place on a third-party rig after termination of both Orion Drilling Contracts, and so had no bearing on whether EQT breached any contractual obligation owed to Orion or its rationale for termination in 2016. ECF No. 59-5. EQT raised similar objections to Orion's request that it provide documents showing progress reports or KPI reports sent by EQT to entities that replaced

Orion with regard to drilling operations, and argued that this post-termination information was not relevant to whether EQT breached its contract with Orion. ECF No. 59-7.

The Court agreed with EQT, finding that any evidence of EQT's conduct subsequent to termination is not relevant to the issue of whether Orion provided substandard equipment and drilling services in performance of its contractual obligations to EQT, or whether EQT breached any obligation owed to Orion up to the date of termination. ECF No. 85 at 8-9, 15-16. The Court further determined that a "five-year look back" from September 2016 was an appropriate and reasonable limit on discovery. Id. at 11.

Orion contends that the Court's rulings were prejudicial. It is clear, however, that Orion possessed information regarding the occurrence of the post-termination dropped block incident and was not precluded from presenting this evidence at trial. To the extent Orion requested post-termination information to establish that its performance was within industry standards, Orion was not harmed. Orion proffered the testimony of its CEO and two industry experts related to its performance under the Rig 17 and Rig 18 Drilling Contracts. Each testified regarding Orion's compliance with industry expectations. Two of the three testified that it was not "industry standard for a rig to have three dropped blocks." ECF No. 178 at 144 (Tonder); ECF No. 178 at 178 (Van Camp). In addition, Orion's CEO testified that while he did not know the industry average for NPT, "down time" for its rigs was not beyond that which is ordinary and expected in the industry. ECF No. 379 at 187, 194. The jury was free to accept or reject this testimony in determining the propriety of EQT's termination of each Drilling Contract based upon Orion's performance. Accordingly, Orion's motion for a new trial based upon the denial of the two Motions to Compel is denied.

### 11. Cross-examination of David Elkin

Orion contends that it sustained prejudicial error due to the Court's limitations on cross-examination of David Elkin, EQT's chief witness at trial. ECF No. 372 at 37. In particular, Orion complains that the Court precluded examination with regard to the financing of Rig 17 and Rig 18, whether drilling schedules were impeded by Orion's NPT, and facts related to the formation of the Fourth Amendment to the Rig 18 Drilling Contract. Id. at 37-38. Orion contends that these limits "rise to the level of violating Orion's right to due process." Id. at 39.

EQT responds with record citations demonstrating that Orion was permitted to elicit the requested information or failed to ask follow-up questions that would have garnered the information it now complains was preempted by the Court. ECF No. 386 at 40-42. EQT therefore disputes Orion's due process claims and assertions of error.

Upon review of the record and Orion's objections, the Court finds a new trial is not warranted on the basis of Elkin's testimony. It is generally recognized that while cross-examination must not be unduly limited, "no matter the importance of a witness to any party, a district court may always place reasonable limits on cross-examination to avoid 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" U.S. v. Fattah, 914 F.3d 112, 182 (3d Cir. 2019) (internal citation omitted). In this instance, the Court's limits on cross-examination, after timely objection by EQT, were focused and targeted to Orion's attempts to elicit testimony previously deemed lacking relevance, and/or previously addressed in the Court's rulings on motions in limine, or beyond the scope of direct examination.

To that end, Orion presented Elkin in its case-in-chief "as if on cross" for over three hours and conducted a second equally extensive cross-examination when EQT presented Elkin in its

case-in-chief. See generally, ECF Nos. 351, 353. In the course of its examination, Orion was permitted to address subjects that it now claims were limited or precluded, including questions related to Orion's ownership, construction, and payment for construction of Rig 18, drilling down time, Elkin's oversight and participation in the preparation of the ADC report, and the fourth amendment to the Rig 18 Drilling Contract. ECF No. 353 at 152, 169-77, 184-86, 190-191; ECF No. 355 at 11, 42, 51-52. Limitations, however, were placed upon Orion's attempt to examine Elkin with regard to purported financial motivation to breach, which the Court had previously ruled was not relevant to the issues to be determined at trial. ECF No. 353 at 187-190. Based upon the record, Orion has not established an undue limitation on the scope of cross-examination sufficient to support the grant of a new trial.

### 12. Cross-Examination of Joshua Cunningham

EQT called Joshua Cunningham as a fact witness to describe the events of June 7, 2016, leading up to the third dropped block incident. ECF No. 334 at 23-27. Orion contends that the Court improperly and prejudicially limited its ability to elicit testimony from Cunningham relative to Orion's program of safety training, his experience on other rigs that had uncontrolled block events, his knowledge of a dropped block on another EQT rig, and his willingness to return to work on Rig 18. ECF No. 373 at 40. As to each of these questions, the Court sustained EQT's timely objections that Orion sought to elicit testimony beyond the scope of direct testimony. ECF No. 334 at 27-8.

Federal Rule of Evidence 611(b) requires that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Fed. R. Evid. 611(b). The trial court possesses discretion to limit the scope of cross examination to ensure that it reflects issues raised on direct. Trout v. Milton S. Hershey Med. Ctr., 576 F. Supp.

2d 673, 678 (M.D. Pa. 2008).  Rigid adherence to this rule does not constitute error.  <u>Williams v. Giant Eagle Markets, Inc.</u>, 883 F.2d 1184, 1190 (3d Cir. 1989).  In this instance, Orion could have called Cunningham in its case-in-chief as to the topics it now contends are vital to adjudication of its claim.  Orion's failure to do so does not render the Court's rulings error.

### 13. Evidence of WPX Drilling Operations

At trial, EQT presented the video testimony of Brian Knopp, a drilling system supervisor employed by WPX, LLC.  Knopp testified that WPX contracted with Orion to use Rig 18 for drilling operations.  ECF No. 362 at 2.  His experience with Rig 18 included a dropped block event, a Bonitron failure, and multiple NPT events "associated with the IDS control system as it was a part of WPX's rig fleet."  <u>Id.</u> at 4.  The dropped block event occurred on June 19, 2017, due to a mechanical failure in the drawworks.  The cause of this fourth dropped block incident was identified as the failure of a coupling in the IDS drawworks due to the lack of sufficient lubrication, causing misalignment of gear teeth.  <u>Id.</u> at 4-8. The misalignment caused the coupling to come apart, and the drawworks lost connection to the motor, leading to an uncontrolled descent.  The failure was not recognized by the control system, which operated as if the drawworks was stationary, and the drawworks hit the rig floor, damaging the rig elevators and bales.  <u>Id.</u>  IDS personnel corrected the problem by encoding the control system to identify a mismatch between the motor and drawworks and to automatically apply the brakes.  <u>Id.</u> at 9.

Prior to trial, Orion filed a motion in limine to exclude evidence of this fourth dropped block event as irrelevant and unfairly prejudicial.  ECF Nos. 176, 177.  Orion contended that the 2017 incident could not have served as a basis for EQT's termination in 2016, given the terms of the Fourth Amendment to the Rig 19 Contract, whereby Orion would indemnify EQT for a subsequent uncontrolled block movement for one year after the date that Rig 18 returned to active

drilling operations.  ECF No. 177 at 3-4.  Orion further argued that admission of this evidence would serve to prejudice or confuse the jury.  Id. at 5.

EQT responded that evidence of the dropped block incident was directly relevant to "Orion's claim that it completed all necessary repairs and preventative measures on Rig 18 such that EQT should have accepted its resumption of work." ECF No. 217 at 4.  EQT presented evidence establishing that the exact defect that caused the fourth incident had been identified by Orion during its completion of the FMEA conducted by Orion in August 2016, which listed poor lubrication for the motor to gearbox coupling as presenting an ongoing danger of a dropped block incident. ECF No. 217; ECF No. 238 at 5, Row 4.  EQT further argued this evidence was relevant to Orion's August 2016 representation that all FMEA issues had been corrected, and the Rigs could safely resume operation.  However, as indicated by the fourth dropped block incident report, ECF No. 238-3, the WPX incident established not only that Orion failed to complete the proper maintenance and lubrication of the coupling, but also failed to identify a software programming change to the control system that would have prevented the incident.  EQT therefore argued that the fourth incident was directly relevant to refute Orion's contention that it had identified all control system faults, and undertaken all repairs and preventative measures such that EQT's termination of the Drilling Contracts was improper.  ECF No. 217.

Through its motion in limine, Orion implicitly invoked Rule 404 of the Federal Rules of Evidence, which generally prohibits evidence of other acts unless it is admissible for another purpose, such as knowledge or lack of accident.

 To be admissible under Rule 404(b), other acts evidence must meet the following four-part test:

(1)     The evidence must have a proper purpose under Rule 404(b);

(2)       It must be relevant under Rule 402;

(3)       Its probative value must outweigh its prejudicial effect under Rule 403; and

(4)       The district court must charge the jury to consider the evidence only for the limited purpose for which it was admitted.

Becker v. ARCO Chem. Co., 207 F.3d 176, 189 (3d Cir. 2000) (internal quotations omitted). In Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 520 (3d Cir. 2003), the United States Court of Appeals for the Third Circuit held that in an age discrimination suit, the trial court properly admitted evidence that after plaintiff's termination, his employer hired someone in the same age range. This evidence of a "subsequent good act in a civil case" was offered to rebut plaintiff's evidence that the employer hired several people under the age of 40 after he was fired, such that the reasons for his termination were pretextual. Similarly, in Parvez & Razia Yazdani v. BMW of North America, LLC, 188 F. Supp. 3d 486, 494 (E.D. Pa. 2016), the district court granted in part and denied in part a manufacturer's motion in limine in a products liability action to preclude evidence of similar incidents, and limited admission to reported incidents involving the same model and substantially the same circumstances. In addition, because the proffered reason for the evidence was to show notice of defect prior to plaintiffs' purchase, the district court excluded incidents that occurred after the date plaintiffs' model was manufactured.

The Court denied in part Orion's motion in limine, finding that the evidence was admissible for a proper purpose and that it was not unduly prejudicial. EQT sought to admit evidence of the later incident to rebut Orion's claims that (1) it had identified all control system defects that could lead to a dropped block incident, (2) had performed all preventative measures identified in the FMEA and the ADC report, and (3) EQT was not justified in refusing to resume drilling operations. ECF No. 348 at 61-63. The Court determined that the incident was directly connected to an FMEA

finding that in the event of inadequate lubrication and misalignment, a coupling failure would result in the loss of block control. ECF No. 238-2 at 6. The June 2017 occurrence therefore was relevant and highly probative to Orion's contention that it had cured all known or identified defects, and otherwise rendered the control system safe. Because Orion made similar representations after the first, second, and third dropped block incident, this evidence further demonstrated that EQT appropriately refused to rely upon Orion's representations that all defects had been cured.

The Court instructed the parties that a proper foundation would be required at trial before evidence of the fourth incident could be presented. In particular, this Court ruled that if Orion presented evidence or testimony at trial that it had cured all identified issues and thus could safely conduct drilling operations, it would "open[] the door" to evidence of post-FMEA safety issues. ECF No. 348 at 62-63. The Court further stated that it would provide an appropriate instruction to the jury as to the limited purpose of the evidence and requested counsel for Orion to provide a proposed instruction. Id. at 63.[6]

At trial, Squires testified that all defects had been cured in August 2016, such that EQT's refusal to resume drilling was unexcused. ECF No. 379 at 149-151, 205-209. With respect to the particular defect that caused the fourth incident, Squires testified that, at EQT's insistence, Orion directed IDS to perform a "desktop" FMEA and retained RigQA to conduct review of the corrective action taken as a result of the FMEA. ECF No. 379 at 149-50. An IDS representative testified that the FMEA examined the interaction between the control system, the motor and gearbox assembly, and the drawworks, and identified potential errors. ECF No. 331 at 50-51. The FMEA identified the risk that the motor to gearbox coupling would fail in the absence of

---

[6] Orion did not thereafter submit an instruction related to the admission of this evidence.

appropriate lubrication causing gear teeth misalignment, and that this would lead to a loss of block control.  Id. at 121-22.  Squires forwarded a letter to Elkin documenting the completion of the FMEA and related repairs, and stated that Rig 18 was prepared to resume drilling on EQT's behalf. ECF No. 379 at 150-51, 153.

With this foundation, and Orion's representation that it had cured all defaults, the Court overruled Orion's objection that introduction of evidence of the fourth dropped block incident was irrelevant and unfairly prejudicial.  ECF No. 352 at 12-14.  Simply put, Orion opened the proverbial door.  Thereafter, IDS's engineer testified that the fourth dropped block incident resulted from a mechanical coupling fail "due to a lack of grease."  Id. at 124.  Under these circumstances, Orion has failed to demonstrate that the evidence of the fourth incident was admitted for an improper purpose or is otherwise unduly prejudicial.

Orion next argues that the Court improperly permitted prejudicial testimony related to WPX's experience with Orion and Rig 18 regarding the "lack of implementation" of Orion's safety program.  ECF No. 372 at 41.  However, Orion did not object to this evidence on the basis of relevance or prejudice, but solely as to "foundation" and "speculation."  ECF No. 324 at 23:14 – 24:3.  Knopp provided sufficient information regarding his receipt and review of Orion's safety materials and was present on site to observe implementation.  ECF No. 362 at 2-3.  Accordingly, the admission of this testimony was not error.

### 14. Spoliation Rulings

Orion next contends that it suffered prejudicial error from the Court's issuance of a permissive spoliation of evidence instruction (characterized by Orion as "mandatory") with regard to documents that were destroyed by or not produced by Orion in discovery.  ECF No. 372 at 42. Orion further asserts error in the Court's purported failure to permit rebuttal evidence.  Id.  The

issue of spoliation was raised by way of EQT's Motion for Sanctions for Spoliation of Evidence, ECF No. 117, based upon the apparent destruction of notes and documents in the possession of key Orion drilling operations supervisory personnel just days before Orion filed this action. ECF No. 135.

Spoliation of evidence occurs if (1) the evidence was in the defendant's control; (2) the evidence is relevant to the plaintiff's claims; (3) there has been actual, intentional suppression or the withholding of evidence in bad faith; and (4) the duty to preserve evidence was reasonably foreseeable. Bull v. United Parcel Service, Inc., 665 F.3d 68, 73 (3d Cir. 2012) (citing Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)).

In early October 2015 and as late as June 16, 2016, the parties acknowledged the probability of litigation regarding EQT's anticipated termination of the Drilling Contracts. See ECF Nos. 367-13 (Orion's response to EQT's notice of default after the second dropped block incident in October 2015 threatened "[t]aking steps to attempt to void our agreement will turn the situation into a legal battle that will prove costly to all concerned"); ECF No. 367-28 ¶7. As anticipated, on September 30, 2016, Orion commenced this breach of contract action challenging EQT's termination of the Drilling Contracts. Just two days earlier, Jamie Garza, Orion's Superintendent for Rig 17 and Rig 18 drilling operations, left his DuBois, Pennsylvania office for a different position. ECF No. 360 at 2. Garza was responsible for reporting to Orion and EQT with regard to operations and contract performance issues, and served in this position at the time each dropped block incident occurred on both Rig 17 and Rig 18. Id. at 19, 28, 30-32. On a regular basis, Garza took notes of meetings and operational issues for purposes of preparing daily reports. Despite the prospect of litigation filed by his employer over the performance of both rigs on his watch, Garza threw his notes away or left them in his office. Id. at 1-2. Any notes he "left"

were never produced during discovery. Similarly, Garza's supervisor, Owen Brandt, Orion's Vice-President of Operations, failed to retain his notes of conference calls and meetings, or his personally annotated Rig 17 and Rig 18 Drilling Contracts. ECF No. 359 at 5-6. He threw his notes out or left them with Orion when he changed jobs, and Orion failed to produce any of the notes during discovery.

Under the circumstances presented, and giving consideration to the subject matter of the notes and timing of anticipated and threatened litigation filed just days after Garza's departure, the Court found that EQT met its burden of proving that Orion had acted in bad faith with regard to the willful spoliation or failure to preserve evidence in the possession of two key employees. ECF No. 135. However, the Court permitted Orion to present testimony regarding the circumstances of how the documents were purportedly "thrown away" to rebut the inference that the destruction was intentional. ECF No. 353 at 12. The Court further instructed the jury that it "[*m*]*ay* infer that evidence not preserved or destroyed by Orion was relevant to this case, would have been unfavorable to Orion and favorable to EQT. *Whether this finding is important to you in reaching a verdict in this case is for you to decide. You may choose to find that it is determinative, somewhat determinative or not at all determinative in reaching your verdict*…." ECF No. 331 at 148; ECF No. 332 at 26-27, 31 (italics added).

The Court considered Orion's relative fault in failing to preserve evidence regarding Rigs 17 and 18 in the possession of its most senior operations personnel, as well as the timing of when the documents were "lost." Factors favoring the adverse inference instruction included the likelihood that the lost evidence would have buttressed EQT's contention that the control system defects were known and remained uncured through the date of termination, as well as the likelihood that Orion understood the continued viability of Section 6.5 of the contract, given its

attempts to cure within seven days of the first and second dropped block incidents. The prejudice sustained is not fanciful given that both employees acknowledged that they recorded contemporaneous notes regarding Rig 17 and Rig 18 drilling and rig operations and the contracts at issue. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994) (plausible, concrete suggestion as to what missing evidence might have been is necessary to support spoliation claim). In terms of the sanction imposed, the Court provided a permissive adverse inference that allowed the jury to draw its own conclusions after weighing the credibility of each witness and his testimony. Under these circumstances, Orion did not sustain impermissible prejudice from its failure to preserve relevant evidence and a new trial is not warranted on the basis of the Court's instruction with regard to spoliation.

### 15. TIA Portal and IDS Source Code

Orion next asserts prejudicial error in the Court's exclusion of evidence and testimony related to certain IDS software and hardware functionality that it failed to disclose to EQT in the course of discovery, in defiance to a prior Court Order requiring production. ECF No. 372 at 47. Orion's motion in this regard does not raise any arguments in favor of admission not previously considered by the Court after detailed review of the course of discovery in this matter. Accordingly, the motion for a new trial challenging the exclusion of the testimony and evidence regarding the TIA Portal and IDS Source Code is denied for the reasons set forth in the Opinion and Order entered December 11, 2018 at ECF No. 243. Orion Drilling Company, LLC v. EQT Production Company, No. 16-1516, 2018 WL 6504374 (W.D. Pa. Dec. 11, 2018).

### 16. Ray Testimony

Orion seeks the grant of a new trial based upon prejudicial error it contends resulted from the denial of Orion's motion to strike the testimony of EQT's expert Justin Ray, Ph.D., regarding

the development and operational deficits of the IDS control software system.  ECF No. 372 at 52; and see, ECF Nos. 179, 295.

Orion contends that Ray's opinions are irrelevant and do not "fit" the issues in dispute between the parties.  Orion argues that Rigs 17 and 18 were accepted "as is" and as such, EQT accepted all risks associated with the quality of the Rigs, including its software.  Orion next contends that pursuant to the terms of the Drilling Contracts, termination without payment of liquidated damages is permissible based only upon defects in the performance of drilling operations and not the quality of the drilling equipment.  Finally, as to "fit", Orion contends that the issue of control software was neither raised as a reason for termination nor included in the ADC list of defects requiring repair.  Because the control system was not included as a listed defect, it was not within scope of Fourth Amendment by which EQT reserved the right to terminate the Drilling Contracts in the event itemized items were not satisfactorily cured.

Orion further objects to the admission of Ray's opinions regarding the role of IDS control software in all four dropped block incidents, because each opinion is based upon conclusions of others, and not an independent analysis of the cause.  Ray's opinions in this regard were developed in part from statements made by IDS and Orion employees or experts who confirmed that the programming errors were the cause of the first, second, and fourth dropped block incidents.

Pursuant to Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained that Rule 702 has three major requirements: the proffered witness must: (1) "be an expert, i.e. must be qualified"; (2) "testify about matters requiring scientific, technical or specialized knowledge"; and (3) present testimony that may "assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). In order to be admitted, an expert's testimony must demonstrate "qualification, reliability and fit." Schneider ex rel. Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). "The party offering the expert must prove each of these requirements by a preponderance of the evidence." Mahmood v. Narciso, 549 F. App'x 99, 102 (3d Cir. 2013) (citing In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999)).

Rule 702 has "a liberal policy of admissibility," Pineda, 520 F.3d at 243 (quoting Kannankeril v. Terminix Intern., Inc. 128 F.3d 802, 806 (3d Cir. 1997)), and the "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Exclusion is disfavored because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993)).

As to reliability, Ray's opinions incorporated Orion's own root cause analysis, ECF No. 145-6 at ¶¶ 7-8 (cause of dropped blocks was data entry error in program); ECF No. 217 at Ex. C (contributing factors include a design oversight in that electronic drilling system did not include drum and motor encoder mismatch). Ray then referred to the identified cause of each dropped block in his analysis and conclusion that the individual glitches are symptoms of the overall lack of appropriate architecture, design and maintenance of the software control system. See, e.g., ECF No. 180-3 at ¶¶ 74, 87-110. Orion was free at trial to challenge the data relied upon by Ray and

the weight to be afforded his conclusions, but Orion has not established that incorporation of the data renders Ray's opinion unreliable.

As to "fit", Orion's reliance upon the "as is" clause to justify exclusion of evidence of rig defects ignores express competing contractual obligations that impose ongoing performance measures. As explained *supra,* the "as is" clause does not annul Orion's simultaneous contractual obligations to conduct safe and nonhazardous drilling operations in accordance with industry standards and regulations, and thus does not warrant exclusion of Ray's opinions regarding defects in the integration of the IDS control system. Orion's motion for a new trial on the basis of Ray's testimony therefore is denied.

### 17. Stone Testimony

Orion seeks a new trial based upon the admission of expert testimony provided by Charles Stone, a mechanical engineer with over 35 years of experience in the oil and gas drilling industry, who testified as an expert on behalf of EQT. Stone worked as a drilling applications engineer, with personal experience analyzing the output of drilling rig software and determining conformance with industry standards. ECF No. 334 at 47-50. Orion sought to exclude Stone's testimony and by its motion in limine, ECF No. 181, contended that despite Stone's experience, his testimony regarding dropped block incidents and excessive NPT as violating industry standards is irrelevant and fails to "fit" the facts of the case. ECF Nos. 182, 190.

With Rule 702 expert testimony admission considerations in mind, the Court reviewed Stone's report, ECF No. 190-6, Orion's Motion in Limine and Brief in Support, ECF No. 182, as well as EQT's Brief in Opposition, ECF No. 215. The Court determined that Stone's testimony both fit the case and is sufficiently reliable to be deemed admissible. The Court further found that Stone possesses specialized experience as an engineer in the oil and gas drilling industry to render

expert testimony as to the subject matter at issue. This experience includes extensive familiarity with industry customs and practices, working as a consultant for "hundreds of operators." ECF No. 334 at 49.

Based upon his experience, Stone proffered testimony at trial that a dropped block is not a common occurrence, and that in his 37 years in the industry, he personally was aware of only four incidents. Id. at 51-52. Stone testified that as a general industry standard, a rig that experiences four dropped blocks is "not acceptable" because it "creates such a hazardous environment." Id. This testimony confirmed that of several of Orion's employees regarding the rarity of dropped block incidents in the oil and gas drilling industry.

Stone testified as to NPT issues that he reviewed drilling reports for both Rig 17 and Rig 18 and identified time that was not spent drilling because of mechanical breakdowns or control system integration faults. He determined that over the nineteen months Orion conducted drilling operations on behalf of EQT, Rig 17 experienced an average of 56 hours per month of NPT and Rig 18 experienced an average of 88 hours per month of NPT. Both rigs far exceeded the accepted standard of approximately twelve hours per month of NPT per rig. Id. at 55-56. Stone based his calculation of the industry average NPT on standard daywork contract provisions and "37 years in the drilling industry and being around drilling operations and being familiar with the key performance indicators and the metrics that drilling engineers look at before they contract a rig or before they decide to keep a rig." Id.

Orion challenges the reliability of this testimony, asserting it is not based upon identifiable written standards. During cross-examination, however, Orion did not contest Stone's cited industry average of 12 hours per month. Instead, Orion disputed Stone's inclusion of certain incidents in his calculations that Orion believed should not be considered NPT. Id. at 59-74. Stone

explained his methodology in determining the hours included in each rig's NPT as based upon documented drilling operation issues unrelated to EQT's cessation of operations. Under these circumstances, the opinions comprised more than a subjective view of standards and data, and offered industry recognized and accepted levels and categories of NPT. A new trial on the basis of Stone's testimony is not warranted.

### 18. Verdict and Weight of the Evidence

Orion urges that the Court grant a new trial because it contends that the jury's verdict was against the weight of the evidence. In particular, Orion asserts (1) that the undisputed evidence at trial conclusively established Orion's breach of contract claims, and (2) there is no legally sufficient evidentiary basis for the jury to find material breach or that EQT properly terminated the Rig 17 and Rig 18 Drilling Contracts. ECF No. 372 at 56.

The threshold is quite high for a party seeking a new trial on the basis of the weight of the evidence. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol. Rail Corp., 926 F.2d at 1353. In this instance, and for the reasons discussed throughout this Opinion, the jury's verdict was based on a legally sufficient evidentiary basis and was not contrary to the weight of the evidence. Orion presented its case in chief without adequately addressing the existence of alternate termination provisions, pursuant to which EQT was permitted to shut down drilling operations and terminate the Drilling Contracts without payment of liquidated damages. The evidence at trial established that the defects in the IDS control system rendered both Rig 18 and Rig 17 extraordinarily dangerous to employees and contractors working on the drilling platform, and that the defects remained uncured despite several opportunities to do so, and despite

the insistence of Orion's CEO that drilling operations could safely be resumed. Under these circumstances, the evidence was sufficient for the jury to find, as it did, that EQT did not breach the Rig 18 contract and that Orion was in material breach of the Rig 17 Drilling Contract. Accordingly, Orion's motion for a new trial on the basis of the weight of the evidence is denied.

## IV. CONCLUSION

For the foregoing reasons, Orion's Motion for New Trial and its Renewed Motion for Judgment as a Matter of Law are properly denied. An appropriate order follows.

## ORDER

AND NOW, this 10th day of September, 2019, IT IS HEREBY ORDERED that Orion's Motion for New Trial Pursuant to Rule 59, ECF No. 371, and its Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), ECF No. 373, are denied.

BY THE COURT:

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record via CM/ECF